Ronnie E. HIGHTOWER, by Mark F. DEHLER as guardian ad litem and next friend, Donald Ruff, Sylvia Butts and Joy Shepard on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Tommy OLMSTEAD, individually and in his official capacity as Commissioner of the Georgia Department of Human Resources, et al., Defendants.

Civil Action File No. 1:93CV641JTC.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 1996.

Beverly Patricia Downing, Office of State Attorney General, Atlanta, GA, for movant Charter Lake Hosp. and defendant Roland.

George Pennebaker, Office of George Pennebaker, Dallas, GA, Susan C. Jamieson, Atlanta Legal Aid Society, DeKalb County Regional Office, Decatur, GA, Phyllis J. Holmen, Torin Dana Togut, Lisa Jane Krisher, Georgia Legal Services Program, Central Office, Gerald R. Weber, American Civil Liberties Union, Nancy Lord, Office of Nancy Lord, Atlanta, GA, Howard Gary Sokol, Georgia Legal Services, Macon, GA, for plaintiff Ronnie E. Hightower.

Jonathan A. Zimring, Zimring & Ellin, Atlanta, GA, for plaintiff Joy Shepard.

Susan C. Jamieson, Atlanta Legal Aid Society, DeKalb County Regional Office, Decatur, GA, Phyllis J. Holmen, Torin Dana Togut, Lisa Jane Krisher, Georgia Legal Services Program, Central Office, Jonathan A. Zimring, Zimring & Ellin, Gerald R. Weber, American Civil Liberties Union, Nancy Lord, Office of Nancy Lord, Atlanta, GA, Howard Gary Sokol, Georgia Legal Services, Macon, GA, for plaintiff Donald Ruff.

George Pennebaker, Office of George Pennebaker, Dallas, GA, for plaintiff Sylvia Butts.

Beverly Patricia Downing, Carol Atha Cosgrove, William C. Joy, Office of State Attorney General, Atlanta, GA, Jefferson James Davis, Davis & Davis, Decatur, GA, for defendant David L. Evans.

Jefferson James Davis, Davis & Davis, Decatur, GA, for defendants James W. Mimbs, M.D., Jose Roberts Flores, M.D., George Grant, M.D., James B. Bradley, M.D., Foster Brin, M.D., Anita-Rae Smith, M.D.

Beverly Patricia Downing, Carol Atha Cosgrove, William C. Joy, Office of State Attorney General, Jefferson Davis, Jr., Kilpatrick

Stockton, Atlanta, GA, for defendants Britton Dennis, Tommy Olmstead.

### *ORDER*

CAMP, District Judge.

This action is before the Court on Defendants' Motion for Summary Judgment [# 93–1], and Plaintiffs' Motion to Correct Clerical Mistake [# 101–1]. Parties argued the present motion for summary judgment before the Court on June 7, 1996.

## I: FACTS

### A) Background

This suit is a class action brought by a group of mental patients at a state mental hospital to enjoin the allegedly unlawful administration of antipsychotic (also called neuroleptic or psychotropic) drugs. In the instant case, psychotropic medication represents antipsychotic, antimanic, antidepressant, antianxiety, and antiobsessive drugs. (Policy Memo Sec. II, IA).

Psychotropic drugs are a large class of drugs which affect mental activity.[1] These drugs, including Thorazine, Mellaril, Prolixin, Haldol, and Ativan, are used to treat schizophrenia and other serious psychotic disorders. They reduce the symptoms of hallucinations, delusions, paranoid ideation, and disturbed mental thought in patients. "The purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes." *Washington v. Harper*, 494 U.S. 210, 229, 110 S.Ct. 1028, 1041, 108 L.Ed.2d 178 (1990). Thus, the drugs are "mind-altering." *Mills v. Rogers*, 457 U.S. 291, 293 n. 1, 102 S.Ct. 2442, 2445 n. 1, 73 L.Ed.2d 16 (1982). Many medical authorities consider these drugs to be the primary treatment for acute and chronic mental disorders.

On the other hand, psychotropic drugs also involve a risk of adverse side effects. Such side effects range from short-term discomforts, such as temporary sleepiness or dry mouth, to severe and possibly long-term impairments, referred to as "extrapyramidal side effects." These more severe side effects include dyskinesia (involuntary movements of the muscles in the face, arm, and legs), akathesia (motor restlessness and anxiety), akinesia (unspontaneous or retarded movement), and dystonia (involuntary facial and tongue contractions).

One of the serious side effects is tardive dyskinesia, which involves involuntary movements of face, arm, and leg muscles. This condition does not generally respond to treatment and can persist after psychotropic drug use is discontinued. There is currently no way to predict who will develop dyskinesia or other severe side effects.

### B) This Litigation

The Plaintiff class is made up of current and former patients at Central State Hospital in Millegeville, Georgia. Central State Hospital (CSH) is operated by the Georgia Department of Human Resources for the treatment of persons with mental illness, mental retardation, or substance abuse problems. Plaintiffs brought suit as a class to prevent doctors at CSH from medicating them with psychotropic drugs without their consent. Defendants include physicians at CSH and officials of the Georgia Department of Human Resources. Plaintiffs claim that state officials (1) did not properly inform them of the risks and benefits of medication before seeking consent to administer the drugs, and (2) failed to provide standards or procedural safeguards for continuing forced medication when consent is not given. The class is limited to injunctive and declaratory

---

1. *See Mills v. Rogers,* 457 U.S. 291, 293 n. 1, 102 S.Ct. 2442, 2445 n. 1, 73 L.Ed.2d 16 (1982); *see generally* Brooks, A Comparison of a Mentally Ill Individual's Right to Refuse Medication Under the United States and the New State Constitutions, 8 Touro L.Rev. 1 (1991); Litwiller, Note, Defining Constitutional Parameters: The Forced Drugging of Civilly Committed Mental Patients, 1 S. Cal. Interdisciplinary L.J. 57 (1992); King, Comment, An Involuntary Mental Patient's Right to Refuse Treatment with Antipsychotic Drugs: A Reassessment, 48 Ohio St. L.J. 1135 (1987); Rhoden, The Right to Refuse Psychotropic Drugs, 15 Harv. Civ. Rights–Civ. Liberties L.Rev. 363 (1980); Robinson, Comment, The Forcible Medication of Involuntarily Committed Mental Patients With Antipsychotic Drugs*Rogers v. Okin*, 15 Ga. L.Rev. 739 (1981). The following discussion of the nature of these drugs is taken from these sources.

relief. The named Plaintiffs also seek damages as individuals.

### C) Georgia Law on the Rights of the Mentally Ill

Plaintiffs argue that Georgia law provides insufficient substantive and procedural safeguards to protect their rights under federal law. Plaintiffs argue that two specific statutes are unconstitutional. However, to place those statutes in context, it is necessary to examine several Georgia laws concerning mental health.

#### 1) Challenged Statutes

Plaintiffs challenge the following statutes concerning treatment of mental illness within a state facility.

(a) It shall be the policy of this state to recognize the personal physical integrity of all patients. (b) It shall be the policy of this state to protect, within reason, the right of every individual to refuse medication except in cases where a physician determines that refusal would be unsafe to the patient or others. If the patient continues to refuse medication after such initial emergency treatment, a concurring opinion from a second physician must be obtained before medication can be continued without the patient's consent. Further, in connection with any hearing under this chapter, the patient has the right to appear and testify as free from any side effects or adverse effects of the medication as is reasonably possible. Any patient objecting to the treatment being administered to him shall have a right to request a protective order pursuant to Code Section § 37–3–148.

O.C.G.A. § 37–3–163. A similar statute that applies to the institutionalized mentally retarded, as opposed to the mentally ill, is also challenged. See O.C.G.A. § 37–4–123.

#### 2) Related Statutes

Georgia law provides that an "inpatient" in a mental hospital is a person who is mentally ill and presents a "substantial risk of imminent harm to that person or others" or "is so unable to care for that person's own physical health and safety as to create an imminently life endangering crisis" and who is in need of involuntary inpatient treatment. O.C.G.A. § 37–3–1(9.1). Thus, the term "inpatient" appears to apply primarily to involuntary patients. A determination of mentally ill status requiring involuntary inpatient treatment is made based upon hearings at which the patient has the right to representation and other procedural protections. See O.C.G.A. §§ 37–3–62, –81, & –83. A voluntary patient is a person who exhibits mental illness and applies to a facility for observation and diagnosis. Such a person may be detained and given care and treatment in the facility until the person "has recovered from his mental illness" or "has sufficiently improved" so that hospitalization is no longer necessary. O.C.G.A. §§ 37–3–20 & —21.

A patient in a facility has the right to "receive care and treatment that is suited to his needs and is the least restrictive appropriate care and treatment." O.C.G.A. § 37–3–162(a); Ga. Rules & Regs. § 290–4–6–.02(1)(a). A patient also has the "right to participate in his care and treatment ... to the maximum extent possible," and, unless disclosure is determined and noted to be detrimental to the patient's physical or mental health, he "shall have the right to be fully informed concerning his medication, including its side effects and available treatment alternatives." O.C.G.A. § 37–3–162(b); Ga. Rules & Regs. § 290–4–6(d)(2)(a). "Medication, seclusion, and physical restraints are to be used solely for the purposes of providing effective treatment and protecting the safety of the patient and other persons." O.C.G.A. § 37–3–165(a); Ga. Rules & Regs. § 290–4–6–(d)(1).

To challenge treatment decisions once they have been implemented,

[a] patient or his representative may file a petition in the appropriate court alleging that the patient is being unjustly denied a right or privilege granted by (Chapter 3 (on examination and treatment for mental illness)) or that a procedure authorized by this chapter is being abused. Upon the filing of such a petition, the court shall have the authority to conduct a judicial inquiry and to issue appropriate orders to correct any abuse under this chapter.

O.C.G.A. § 37–3–148(b); Ga. Rules & Regs. ch. 290–4–6–.07. The patient can appeal any order of the proper court pursuant to this provision. Id. The appeal would lie in Supe-

rior Court from the Probate Court or to the Court of Appeals and Supreme Court from the Juvenile Court. In addition, each hospital has an appointed Human Rights Committee with the responsibility of investigating and attempting to resolve complaints from patients internally. Ga. Rules & Regs. ch. 290–4–6–.07(1)(a)1.

### D) CSH Policies and Procedure for Psychotropic Medication

The Georgia Division of Mental Health and Mental Retardation operates its facilities according to Policy Memorandum 1.200, promulgated by the state Department of Human Resources [hereinafter "Policy Memo"]. The record contains Memoranda from 1986, 1993, and 1994. Defendants have presented evidence that CSH followed and presently follows the policies contained in those memoranda.

The substantive provisions of the 1993 and 1994 Policy Memos do not typically differ from the earlier policy. However, some repeated provisions are clarified in the 1994 Memo, such as the inclusion of a definition of "unsafe." In addition, the later Policies incorporate certain procedures not found in the 1986 policy. Where the Policy Memos vary significantly, it is noted *infra.*

According to the Policy, all medication is to be used "solely for the purposes of providing effective treatment and protecting the safety of the patient and other persons and shall not be used as punishment or for the convenience of staff." Policy Memo, Sec. I (citing Georgia Rules and Regulations, ch. 290–4–6, § (IV)3(d)). For initial treatment with psychotropic drugs, consent is required. Policy Memo Sec. II A. The attending physician is responsible for explaining the risks and benefits of psychotropic medication to the patient. *Id.*, sec. II B. In addition, it is the practice of CSH to place pamphlets describing the risks and benefits of these medications in areas accessible to the patients. If the patient is able to give legal consent and does so, then the physician must have the patient sign a consent form which is placed in the Clinical Record.

The attending physician, in consultation with the Treatment Team, must also assess the patient's capacity to consent to the medication. "Assessment of capacity is a sepa-

rate issue from whether or not the patient agrees to or refuses medication." Policy Memo Sec. II 2A (1993 & 1994). The basis for the physician's decision must be documented in the Clinical Record. The 1993 and 1994 Policies note specific factors the doctor must consider in assessing capacity, such as a mental status exam, recent behavior, psychosocial data, the doctor's determination of whether the patient is physically and mentally able to understand the information, and the patient's ability to make and express a decision about medication.

If the patient is not legally competent to consent to medication, substituted consent must be sought. A parent, guardian, or other person temporarily in loco parentis may provide consent for a minor. A court-appointed guardian may provide substituted consent for an adult who has been judicially adjudged to be incompetent. If an adult, as a result of the doctor's assessment, is determined to be incapable of providing legally valid consent, then consent may be sought from one with a durable health care power of attorney, a spouse, parent, adult child, adult sibling, or grandparent. Substituted consent, and the reason therefor, must be made part of the Clinical Record by written form.

When consent to medication cannot be obtained from either the patient or one providing substituted consent, the doctor may medicate the patient only if he or she determines that failure to medicate the patient would render him "unsafe" to himself or others. Emergency medication may be continued under the attending physician's order finding the patient unsafe for a maximum of 72 hours. (The 1986 Policy did not set a time limit for the emergency period but stated only that a concurring opinion was needed after "initial emergency treatment."). If the patient continues to refuse treatment and the physician determines that failure to medicate the patient is unsafe to him or others, then involuntary medication may be continued for up to 30 days, renewable once, with a concurring opinion from a second physician given prior to the expiration of the initial emergency period. The 1994 Policy requires the physician, with input from the treatment team, to conduct a status review every seven days during this stage of involuntary medi-

cation to determine if the patient continues to lack capacity to consent or whether he would be unsafe without medication. The results of this review must be documented in the Clinical Record.

After the second thirty-day period, a Clinical Review is required to continue involuntary medication. The Clinical Review process was mandated by the 1993 interim policy. The attending physician requests the Clinical Review and presents the case to the Review Panel. A Clinical Review Panel consists of three persons (two physicians and one person from an allied discipline) appointed by the Chief Medical Officer. None of these persons are permitted to be members of the patient's treatment team.

The patient has certain procedural protections during the Review process. The patient or person providing substituted consent must be given written notification[2] of the date, time, and location of the Review, the diagnosis, the rationale for the continued involuntary administration of psychotropic medication, the identity of those involved in presenting the case to the panel, and the fact that the patient may be interviewed. The patient also has the right to request assistance from a member of the Hospital's Human Rights Committee. The 1994 Policy requires the patient to be informed that he is entitled to be present at the Review and may have representatives, family, or friends to present pertinent information to the panel.

The purpose of the Clinical Review is for information gathering and is to focus on the question of the safety of the patient and others. It is not designed to be an adversarial process. At the time of the Review, the physician presents the case. The Panel may interview the patient or others with relevant information. Such persons may include the patient's private physician. The Review Panel must render a majority decision within 2 business days of the conclusion of the meeting.

If the Panel authorizes continued involuntary administration of medication, the attending physician must conduct a special review of the patient's status every 90 days while involuntary medication continues. The Clinical Review must be conducted yearly if the patient is still receiving involuntary medication.

The patient must be informed that he may ask for a review of the Panel decision by the Chief Medical Officer and may proceed with external process, including court action. *See* § C *supra.*

### E) The Plaintiffs

Considering the undisputed evidence in the record and construing all other facts in favor of Plaintiffs, the following facts emerge for purposes of this motion.

#### 1) Ronnie Hightower

Plaintiff Hightower suffers from profound mental retardation and schizophrenia. Because of his low level of function, he cannot consent to medication. However, Hightower has not been formally adjudged incompetent.

Hightower's mother initially provided substituted consent for his medication with Prolixin, a psychotropic drug. His mother originally signed the consent forms for his medication on a yearly basis. However, she now alleges that the implications of the forms were not explained to her and that she did not understand their content. She subsequently stopped providing written consent to the medication, because she believed it was hurting her son.

Hightower continues to be treated at CSH and apparently continues to be medicated with Prolixin without the consent of a guardian. His medication is continued on the basis that without medication Mr. Hightower is unsafe to himself and others. According to his Clinical Record, he has approximately 100–135 episodes per month of "disruptive behavior". These disruptive behaviors include pulling down curtains, slapping himself, overturning furniture, striking doors and walls, and refusing to eat. Such activities have resulted in injuries, including numerous bruises and lacerations, and a broken wrist.[3]

---

2. The 1994 Policy requires notification no later than 72 hours before the date of the Review.

3. For example, the broken wrist in February 1992 was either the result of hitting his hand

against a locked door or overturning his bed. A laceration to his eye occurred in August 1993 due to running away from having broken into the

A Clinical Review Panel in 1993 ordered Hightower's involuntary psychotropic medication continued.

### 2) Donald Ruff

Plaintiff Ruff was involuntarily admitted to Central State Hospital and remains an involuntary patient. Ruff has not been adjudged incompetent, nor has substituted consent to medicate him been sought. He suffers from chronic schizophrenia. Ruff is reportedly hostile and aggressive when he is not taking psychotropic medication. In the past, he has threatened to kill his mother.

Defendant Dr. Grant, Ruff's treating physician, sought Ruff's consent to take Haldol. Ruff signed a consent form for medication in 1992. However, Ruff claims he was not informed of the side effects of the drug. Ruff suffered for a time with akathesia from the Haldol. In August of 1993, a Clinical Review Panel determined to continue Ruff's antipsychotic medication.

In February of 1993, a hearing officer of the Probate Court determined that Ruff should remain an involuntary patient because he presented a substantial risk of imminent harm to himself or others and was unable to care for himself. This decision was upheld on appeal to Superior Court in September 1993. Ruff continues to be administered Haldol by injection.

### 3) Sylvia Butts

Plaintiff Butts is diagnosed as depressive. She was admitted to CSH as an involuntary patient, but subsequently became a voluntary patient. She has not been adjudged nor determined to be incompetent to consent to medication. She was asked to sign a form to authorize consent to medicate her with psychotropic drugs. She claims her doctor, Defendant James Bradley, M.D., did not advise her about the type of drugs she needed or the reasons to take the medication. Butts refused consent to the medication.

A few days later, Butts alleges she was advised by a nurse that if she did not consent to the medication, she would be involuntarily medicated. Butts continued to withhold consent. According to the representations Plaintiffs' attorney made at oral argument, nurses station and colliding with a pole outside

Butts was not dangerous or suicidal; however, she refused to eat during this time. Her doctor found her unsafe not to medicate because of increased agitation, threats, anger and depression. Following the state procedures, he ordered involuntary medication.

Butts admitted in her deposition testimony that she "pushed" a staff member after that person had said Butts "had better take" her medicine. Subsequently Butts claims she was taken by hospital security "police" to a restraint room. Her arms were held, and she was pinned to the floor. She alleges that she was unable to breathe. She was then injected with Haldol. After this incident, Butts signed a consent form to accept voluntary medication. However, she claims that her consent was coerced, because she feared that a refusal would lead to forced medication. Butts was later discharged from CSH. There is no evidence in the record that Butts sought judicial review of her medication.

### 4) Joy Shepard

Plaintiff Shepard has been diagnosed with chronic schizophrenia, paranoid type, and a personality disorder. She has not been adjudged nor determined to be incompetent to consent to medication. She also initially refused psychotropic medication, including Trilafon, Mellaril, Prolixin, and Haldol. (There is some evidence that she voluntarily took Mellaril or Prolixin for a short period, but medication was discontinued after she complained of side effects). Shepard alleges she was not provided adequate informed consent.

Shepard testifies that she was not violent or threatening to herself or others during her hospitalization at CSH. She states that she experienced no incidents of inability to care for herself while there. She continued to state that she did not want medication. However, her initial treating physician ordered that Ms. Shepard be forcibly medicated with Haldol injections.

A few weeks later, she met with Dr. Joseph Ionno, Clinical Director of CSH. Dr. Ionno opined that Shepard did not meet the criteria for forced medication. She then the office door.

went unmedicated for approximately two weeks. However, Defendant Anita–Rae Smith, M.D., Shepard's new treating physician, felt that Shepard's delusions were dangerous to her because she did not believe she was mentally ill. According to the Georgia procedures in effect at the time, Dr. Smith determined that Shepard was unsafe. Shepard's medical records reflect a concurring opinion was obtained. Dr. Smith ordered one involuntary Haldol injection of a strength to last for four to six weeks. Shepard was released from CSH in May, 1993.

Shepard knows of no precipitating event leading to Dr. Smith's order for nonconsensual drug administration. She claims she was not harmful to herself or others at the time. Shepard stated that the medication made her sick, causing anxiety, migraines and palpitations. Shepard claims to be allergic to Haldol, although no medical testimony clearly so states. She continues to refuse psychotropic medication on an outpatient basis from her current physicians at Peachbelt Mental Health Center.

### 5) The Class

The situations of the named Plaintiffs are representative of the class. There are several hundred class members. The Rule 23(b)(2) class includes adult persons who are or will be hospitalized in Central State Hospital, Millegeville, Georgia, and who are or will be administered psychotropic drugs without adequate informed consent. The class is limited to injunctive and declaratory relief.

## II: PLAINTIFFS' REMAINING CLAIMS AFTER DISMISSAL

After dismissal of state law claims under the Eleventh Amendment and *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), as well as all damage claims against Defendants in their official capacities (damages against the state), Plaintiffs' remaining claims for relief include: (1) declaratory and injunctive relief based on federal law under 42 U.S.C.

§ 1983 in Counts One through Seven; and (2) state and federal damage claims in Counts Eight and Nine against Defendants individually. § 1983 requires articulation of a federally guaranteed right in order to recover.

The Complaint alleges several theories of recovery. However, Plaintiffs' claims as stated in the Complaint are duplicative. As the Eleventh Circuit has stated, "[o]ur responsibility is to examine [plaintiffs'] cause of action for what it actually is, not for what [they] would have it be." *McKinney v. Pate,* 20 F.3d 1550, 1560 (11th Cir.1994).

■ In essence, Plaintiffs' Complaint states claims for violations of substantive[4] and procedural due process under the Fourteenth Amendment. *Compare Washington v. Harper,* 494 U.S. 210, 221 n. 7, 110 S.Ct. 1028, 1036 n. 7, 108 L.Ed.2d 178 (1990). Plaintiffs first allege a right to informed consent arising from the due process clause. Plaintiffs also claim that the challenged statutes are unconstitutionally vague. The vagueness doctrine implicates substantive and procedural due process rights. *See The Reserve, Ltd. v. Town of Longboat Key,* 17 F.3d 1374, 1378–79 (11th Cir.1994); *United States v. Williams,* 51 F.3d 1004, 1009 (11th Cir.1995); *Hearn v. City of Gainesville,* 688 F.2d 1328, 1332 (11th Cir.1982); *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127–28, 70 L.Ed. 322 (1926). In addition, Plaintiffs' assertion that the lack of procedural and substantive standards for forced medication are arbitrary and capricious states a substantive due process challenge. *See McKinney,* 20 F.3d at 1557 n. 9. & 1559; *Restigouche, Inc. v. Town of Jupiter,* 59 F.3d 1208, 1211 & n. 1 (11th Cir.1995); *cf. Weimer v. Amen,* 870 F.2d 1400 (8th Cir.1989); Nahmod, 1 Civil Rights and Civil Liberties Litigation § 3.11 at 187 (3d ed.1991).

■ The Complaint also alleges violations of the Ninth Amendment. However, the Ninth Amendment standing alone provides

---

4. Plaintiffs claim in Count Two that Defendants violated their rights to substantive due process through a state-created liberty interest. However, where substantive rights are created by state law, these rights are not protected by the substantive component of the due process clause. *McKinney,* 20 F.3d at 1556. *Id.* Therefore, Plaintiffs' § 1983 claim under Count Two states solely a procedural due process challenge.

no particular constitutionally guaranteed freedoms. *Metz v. McKinley* 583 F.Supp. 683, 688 n. 4 (S.D.Ga.1984), aff'd. 747 F.2d 709 (11th Cir.1984); *Charles v. Brown,* 495 F.Supp. 862 (N.D.Ala.1980). It does not confer any rights beyond those granted by other portions of the constitution. *Gibson v. Matthews,* 926 F.2d 532 (6th Cir.1991); *United States v. Vital Health Prods.,* 786 F.Supp. 761 (E.D.Wis.1992). Accordingly, Plaintiffs' claims based on the Ninth Amendment will not be addressed separately. *Cf. Hester v. City of Milledgeville,* 777 F.2d 1492, 1494 n. 3 (11th Cir.1985).

Furthermore, Plaintiffs may be attempting to state a claim based upon a constitutionally protected liberty interest found in the Ninth and Fourteenth Amendments. *See Cruzan v. Director, Mo. Dept. of Health,* 497 U.S. 261, 278, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224 (1990); *Carey v. Population Servs. Int'l,* 431 U.S. 678, 684, 97 S.Ct. 2010, 2015–16, 52 L.Ed.2d 675 (1977). The Supreme Court has held that such a liberty interest in personal privacy is protected by the due process clause. *Id.* Therefore, the Court will analyze Plaintiffs' claims that assert a violation of privacy interests under substantive and procedural due process analysis.

Plaintiffs have cited the Court to no binding authority, and the Court has found none, which affords constitutional recognition of Plaintiffs' claims based upon other portions of the Constitution such as the First Amendment. *Cf. Bee v. Greaves,* 744 F.2d 1387, 1394 (10th Cir.1984) (and citations therein).

Essentially, Plaintiffs' claims which have been judicially recognized are based on a substantive due process challenge and a procedural due process challenge. Both parties agree that, because only prospective relief was requested by the class as a whole, consideration of the rights of the class itself is limited to Georgia's 1994 policy. Thus, the class inquiry is a so-called "legislative" due process challenge to the policy of the State of Georgia. *See McKinney,* 20 F.3d at 1557 n. 9. Any retrospective relief, or due process challenge asserted to the manner in which the Policy was applied to the named Plaintiffs, will be addressed under § IV *infra. See id.*

## III: DEFENDANTS' MOTION

Defendants base their motion for summary judgment on the following grounds: (1) no constitutional deprivation, (2) substantive and procedural provisions of Georgia law satisfy federal due process standards, (3) the class was not certified for damages, and (4) qualified immunity.

### A) SUMMARY JUDGMENT STANDARD

Courts should grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The district court should 'resolve all reasonable doubts about the facts in favor of the non-movant,' ... and draw 'all justifiable inferences ... in his favor....'" The court may not weigh conflicting evidence nor make credibility determinations. *Hairston v. Gainesville Sun Publ. Co.,* 9 F.3d 913, 919 (11th Cir.1993), *rh'g denied* 16 F.3d 1233 (1994)(en banc).

As a general rule, "[the] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). However, the movant's responsibility varies depending upon which party bears the burden of proof at trial on the issue in question.

For issues upon which the movant bears the burden of proof at trial, the moving party must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of its claim on that legal issue. It must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. If the moving party makes such a showing, it is entitled to summary judgment unless the

non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of fact. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993) (quoting *Four Parcels,* 941 F.2d at 1437–38).

On the other hand, when the non-movant bears the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim but may simply point out to the district court that there is an absence of evidence to support the non-moving party's case on the issue in question. *Id.* 2 F.3d at 1115–16. Of course, the movant may offer evidence to affirmatively negate a material fact upon which the non-movant has the burden and which is essential to its claim. In either case, the non-movant may not rely upon allegations or denials in the pleadings. Fed.R.Civ.P. 56(e). The non-movant must respond with sufficient evidence to withstand a directed verdict motion at trial. *Hammer v. Slater,* 20 F.3d 1137, 1141 (11th Cir.1994) (citing *Fitzpatrick,* 2 F.3d at 1116–17). The non-movant may do so either by pointing out evidence in the record which the movant overlooked or by coming forward with additional evidence. *Id.*

"The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty* Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250, 106 S.Ct. at 2511. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the non-moving party's case. *Id.,* at 248, 106 S.Ct. at 2510.

### B) SUBSTANTIVE DUE PROCESS

The substantive aspect of the Due Process Clause protects "fundamental rights" which are rights that are "implicit in the concept of ordered liberty." *McKinney v. Pate,* 20 F.3d 1550, 1556–57 (11th Cir.1994)(quoting *Palko v. Connecticut,* 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937). However, not every limitation on a fundamental right amounts to a violation of Due Process. Instead, whether, and the extent to which, a state can limit a right protected under the substantive component of the Due Process Clause depends on the particular right at issue. Accordingly, a substantive Due Process analysis involves several steps. First, this Court must determine whether a fundamental liberty interest is implicated by the state's actions. Second, this Court must identify any state interests that justify limitations on the liberty interest. Third, this Court must determine what level of scrutiny to apply to the state's actions. Finally, applying the appropriate level of scrutiny, this Court must determine whether the state's limitations on the liberty interest amount to a deprivation of Due Process.

### Plaintiffs' Liberty Interest

Clearly, a significant liberty interest exists in avoiding unwanted medication. *see Harper,* 494 U.S. at 229, 110 S.Ct. at 1041 ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."); *Riggins v. Nevada,* 504 U.S. 127, 134, 112 S.Ct. 1810, 1814–15, 118 L.Ed.2d 479; *Cruzan,* 497 U.S. at 287, 110 S.Ct. at 2856 (O'Connor, J. concurring). Indeed, Defendants do not dispute that both Georgia law and the Due Process Clause create "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." *See Harper* 494 U.S. at 222, 110 S.Ct. at 1036. Therefore, because a significant liberty interest is unquestionably at issue, the next issue becomes identifying any competing state interests that could justify limitations on Plaintiffs' liberty interest in remaining free from the unwanted administration of psychotropic drugs.

### Competing State Interests

Defendants' Brief does not specifically articulate the state interests at stake. Nevertheless, the State's interests may be inferred from the limitations placed on Plaintiffs' liberty and from the factual context of the litigation. First, the state possesses a *parens patriae* interest in the mental and physical health of patients in a state hospital for

the mentally ill. Second, the state has a significant interest in maintaining order and safety in state-run institutions.

■ The effective treatment of mentally ill patients who have been committed to CSH is an important governmental interest. *See e.g. Martyr v. Mazur–Hart,* 789 F.Supp. 1081 (D.Or.1992). The state's power to act in *parens patriae* to insure such treatment is appropriately invoked to accomplish the goal of returning patients to the community at large. *Cf. Harper,* 494 U.S. at 222, 110 S.Ct. at 1036–37. Although the First Circuit held that a state may not raise the *parens patriae* interest absent a finding of incompetency, *Rogers v. Okin,* 634 F.2d 650 (1st Cir.1980), the Supreme Court's later decision in *Harper* rejected a similar argument. *See Harper,* 494 U.S. at 222, 110 S.Ct. at 1036–37; *accord Dautremont v. Broadlawns Hosp.,* 827 F.2d 291, 297–98 (8th Cir.1987). Accordingly, this Court finds that the fact that the patients at CSH are mentally ill and in need of treatment is sufficient to raise the state's *parens patriae* interest.

■ In addition to the state's *parens patriae* interest, ensuring the safety of state-run institutions also represents an important state interest. For example, in *Harper,* the Court reasoned that when the state undertakes to operate a prison, the state assumes a significant "obligation[ ]" to provide a safe environment for both the employees and inmates of the prison. 494 U.S. at 225, 110 S.Ct. at 1038–39. Similarly, in *Youngberg,* the Court found that the state's interest in protecting the safety of the employees of a state-run mental institution could justify limitations on a patient's right to be free from bodily restraints. 457 U.S. at 320, 102 S.Ct. at 2460. *See also Riggins,* at 135, 112 S.Ct. at 1815; *Leeks v. Cunningham,* 997 F.2d 1330, 1335 (11th Cir.1993); *cf. Cruzan,* 497 U.S. at 280, 110 S.Ct. at 2852. Moreover, the Court in *Youngberg* also recognized that the state's "unquestioned duty to provide reasonable safety for all residents and personnel within the institution" must be achieved with limited resources. 457 U.S. at 324–25, 102 S.Ct. at 2462–63.

The state's interest in maintaining the safety of its institutions is also enhanced because Plaintiffs are mentally ill.[5] For example, in *Heller v. Doe by Doe,* 509 U.S. 312, 113 S.Ct. 2637, 125 L.Ed.2d 257, the Court noted that psychotic episodes can be sudden, unpredictable, and violent. Accordingly, the Court concluded that allowing the commitment of mentally ill individuals based on a lower burden of proof than required for the involuntary commitment of mentally retarded individuals did not offend the Equal Protection Clause. *Id.* at 333, 113 S.Ct. at 2650. Similarly, in *Harper,* the Court found that when mental illness exacerbates a prison inmate's propensity for violence, the state's interest in protecting others "necessarily encompasses an interest in providing him [or her] with medical treatment" for the mental illness. 494 U.S. at 225–26, 110 S.Ct. at 1038–39.

Having identified the competing interests at issue, this Court must now determine what level of scrutiny to apply to the state's actions.

*Standard of Review*

Several different standards exist for evaluating Georgia's involuntary medication policy. Typically, social and economic regulations are subject to the "rational basis" tests. *See e.g., Williamson v. Lee Optical,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Under this most deferential analysis, a state regulation is valid if rationally related to a legitimate state interest. *Id.* 494 U.S. at 224–25, 110 S.Ct. at 1038–39; *Heller v. Doe by Doe,* 509 U.S. 312, 318–19, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993)("[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity."). Conversely, under "strict scrutiny", a state regulation is valid only if it is the least restrictive means for achieving a "compelling government interest". *See e.g., Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969). Finally, in some contexts, an intermediate level of scrutiny is appropriate.

---

5. Under Georgia law, patients at CSH are either voluntary patients who have intentionally sought out treatment for mental illness or involuntary patients who have been determined to present a substantial risk of imminent harm to themselves or another because of mental illness. *See supra* § I(C)(2).

See e.g., *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 3335–36, 73 L.Ed.2d 1090 (1982)(equal protection case). The Supreme Court has articulated various formulations of intermediate scrutiny. *See e.g., Id.* at 724, 102 S.Ct. at 3335–36 (holding that gender based classifications are valid if the classification is "substantially related" to "important governmental objectives"); *Youngberg* 457 U.S. at 321, 102 S.Ct. at 2461 ("[W]hether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests.").

Plaintiffs argue that "strict scrutiny" should apply to limitations on the right to be free from involuntary medication. However, the Supreme Court has consistently rejected strict scrutiny as the appropriate standard to review state limitations on this type of liberty interest. *See Riggins v. Nevada*, 504 U.S. 127, 136, 112 S.Ct. 1810, 1815–16, 118 L.Ed.2d 479 (1992); *see also Rennie v. Klein*, 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982) (vacating and remanding *en banc* decision of Third Circuit which applied strict scrutiny in due process analysis of involuntary medication); *Harper*, 494 U.S. at 223, 110 S.Ct. at 1037–38.

■ Despite Plaintiffs' arguments, an intermediate level of scrutiny applies to restrictions of an individual's right to be free from unwanted medication. In the context of involuntary medication, this level of scrutiny involves balancing the extent of the limitations of the plaintiff's liberty interest with the state interests that are served by these limitations. *See Youngberg*, 457 U.S. at 320–21, 102 S.Ct. at 2460–61; *Cruzan*, 497 U.S. at 279, 110 S.Ct. at 2851–52 (citing *Youngberg*); *Mills*, 457 U.S. at 299, 102 S.Ct. at 2448; *Harper*, 494 U.S. at 220, 110 S.Ct. at 1036; *Riggins*, 504 U.S. at 136, 112 S.Ct. at 1815–16; *Heidemann v. Rother*, 84 F.3d 1021 (8th Cir.1996). This balancing test has also been applied in other contexts involving important individual liberty interests. *See Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir.1993) (freedom of family association); *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431 (9th Cir.1996) (freedom to travel to foreign country); *Thomason v. SCAN Volunteer Servs., Inc.*, 85 F.3d 1365 (8th Cir.1996)(liber-

ty interest in care and management of children). ·

Under this balancing test, if the state interest is significant, the Court must determine whether the limitation on Plaintiffs' liberty is an appropriate means of achieving the state interest. *See Youngberg*, 457 U.S. at 320–22, 102 S.Ct. at 2460–61; *cf. United States v. Virginia*, —— U.S. ——, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996)(employing similar equal protection analysis); *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 3335–36, 73 L.Ed.2d 1090 (1982); *see also J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136–37 & n. 6, 114 S.Ct. 1419, 1426 & n. 6, 128 L.Ed.2d 89 (1994).

Importantly, this analysis does not defer to the state's judgment and does not presume constitutionality. *See* Rotunda & Nowak, 2 Treatise on Constitutional Law § 15.4 at 403 & 414 (2d ed.1992) [hereinafter "Rotunda & Nowak"]; *compare Restigouche, Inc.*, 59 F.3d at 1214. On the other hand, as would be the case under strict scrutiny,. the state need not show that its restriction of Plaintiffs' liberty interest is the only means of accomplishing a compelling interest. *Compare Youngberg*, 457 U.S. at 322, 102 S.Ct. at 2461 *with Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). Further, the application of this balancing test must reflect the facts of the individual case. *See Griffin*, 983 F.2d at 1547; *Mills*, 457 U.S. at 299, 102 S.Ct. at 2448; *Youngberg*, 457 U.S. at 320–21, 102 S.Ct. at 2460–61; *Cruzan*, 497 U.S. at 279, 110 S.Ct. at 2851–52; *Cf. Harper*, 494 U.S. at 220, 110 S.Ct. at 1035; *See also generally* Rotunda & Nowak, § 15.4 at 403.

### State Limitations Upon Plaintiffs' Liberty Interest

The limitations which the state of Georgia places upon Plaintiffs' liberty interest are indicated in state statutes, regulations, and policies. A patient in the state hospital for the mentally ill may be medicated solely to provide effective, medically appropriate treatment. *See* O.C.G.A. § 37–3–165(a); Ga. Rules & Regs. § 290–4–6–(d)(1). In addition, the patients must receive the least restrictive treatment suited to their needs.

O.C.G.A. § 37–3–162(a); Ga. Rules & Regs. § 290–4–6–.02(1)(a). Finally, involuntary medication is permitted only when a patient is "unsafe" to himself and others.

As discussed above, Plaintiffs' clearly possess a liberty interest in remaining free from involuntary medication. On the other hand, the state of Georgia possesses a significant interest, indeed a significant duty, to provide a safe and effective environment within state-run institutions and to preserve the safety of Plaintiffs themselves. The means through which the state serves these interests unquestionably place limitations on Plaintiffs' important liberty interest. Therefore, in terms of Substantive Due Process, the ultimate issue before this Court is whether the state's chosen means for serving its important interests strikes an appropriate balance between these interests and Plaintiffs' right to free from unwanted medication. *See Harper*, 494 U.S. at 224, 110 S.Ct. at 1038 (citing *Turner v. Safley*, 482 U.S. 78, 85, 107 S.Ct. 2254, 2259–60, 96 L.Ed.2d 64 (1987)).[6]

### The Appropriate Balance

■ Georgia's policy for the involuntary administration of psychotropic drugs appropriately balances the state's interests and Plaintiffs' right to be free from unwanted medication. First, the use of psychotropic drugs rationally serves the state's interests in running its institutions. Second, allowing patients to refuse the administration of these drugs under all circumstances would jeopardize the rights of other patients. Finally, Plaintiffs have not articulated another effective method of accommodating the competing interests at issue.

The use of antipsychotic medication clearly serves the state's interests. *Cf. Harper*, 494 U.S. at 224, 110 S.Ct. at 1038; *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462–63. The medical benefits and effectiveness of psychotropic drugs are widely accepted. *See Riggins*, 504 U.S. at 141, 112 S.Ct. at 1818

(Kennedy, J. concurring). These drugs reduce the incidence of delusions and violent behavior which can result in injury to the patient or others within the hospital environment. *See id.* This result permits the state to allocate, in a more effective fashion, the resources needed to operate its institutions. *Cf. Youngberg*, at 324–25, 102 S.Ct. at 2462–63; *Harper*, 494 U.S. at 232, 110 S.Ct. at 1042–43.

In addition, allowing Plaintiffs freedom to refuse psychotropic drugs under the conditions described in this case may infringe on the constitutional rights of others in Plaintiffs' environment. *See Harper*, 494 U.S. at 225, 110 S.Ct. at 1038–39; *Youngberg*, 457 U.S. at 320, 102 S.Ct. at 2460. The state has a duty to provide reasonable personal security to those under its care or control. *See id.*, at 315–16, 102 S.Ct. at 2457–58 (citing *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) and *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)); *cf. DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 200–01, 109 S.Ct. 998, 1005–06, 103 L.Ed.2d 249 (1989). Unfettered accommodation of Plaintiffs' right to be free from drugs once they have been determined to be "unsafe" would be inconsistent with the state's constitutional duty to other patients and CHS staff members. *See Youngberg*, 457 U.S. at 320, 102 S.Ct. at 2460.

Finally, Plaintiffs have offered no evidence of more appropriate means to accomplish the State's interests. *Compare Harper*, 494 U.S. at 224–25, 110 S.Ct. at 1038–39. While the risks of serious side effects from these drugs are real, the options for treating patients who are unsafe are limited. It is far from clear that physical restraint, isolation, or other alternatives are any less restrictive of liberty than, or provide as much potential medical benefit, as psychotropic drugs. *See Riggins*, 504 U.S. at 141, 112 S.Ct. at 1818. Further-

---

**6.** The Court is aware that the plaintiff in *Harper* was a prisoner. Such status arguably gives the *Harper* plaintiff a diminished liberty interest compared to Plaintiffs in the instant case. *See Riggins*, at 135–36, 112 S.Ct. at 1815. On the other hand, the administration of psychotropic drugs in *Harper* took place not merely in a prison environment, but in a special treatment center for mentally ill prisoners. *See Harper*, 494 U.S. at 214–17, 110 S.Ct. at 1032–34. The purpose of such a center is to treat mental illness in order to return the inmates to the general prison population. *See id.* As such, the state interests in *Harper* are analogous to those in the present case.

more, Georgia law permits involuntary medication only where it is medically determined to be the least restrictive of the available alternatives.

In fact, Plaintiffs do not contest the propriety of involuntary medication with anti-psychotic drugs in all situations. Instead, Plaintiffs argue that the Georgia policy does not sufficiently protect their interests. Specifically, Plaintiffs argue that *Harper* establishes the constitutional baseline for the administration of antipsychotic medication. Therefore, Plaintiffs argue that because Georgia law fails to comport with the standards enunciated in *Harper*, Georgia's policy is unconstitutional.

This Court disagrees with both aspects of Plaintiffs' argument. First, *Harper* did not hold that the standards of Washington state were the minimum federal due process requirements for involuntary medication. Instead, the Supreme Court merely held that the Washington scheme did not violate federal constitutional requirements. *See Harper*, 494 U.S. at 222, 110 S.Ct. at 1036–37; *Leeks v. Cunningham*, 997 F.2d 1330, 1333 (11th Cir.1993). Second, although not identical, Georgia's policy for the involuntary medication is substantively similar to the policies approved in *Harper*.

The Court notes that, although the plaintiff in *Harper* was a prisoner, the state interests were similar to those of Georgia in the present case. In *Harper*, the state intended the treatment to facilitate the plaintiff's return to the general prison population. Therefore, the state had an interest in providing plaintiff "with medical treatment consistent not only with [his] own medical interests, but also with the needs of the institution." *Harper*, at 226, 110 S.Ct. at 1039. Likewise, in this case, Georgia's interest is to provide Plaintiffs with effective medical treatment that is also consistent with the needs of Central State Hospital.

Moreover, the substantive aspects of the Washington involuntary medication policy are similar to Georgia's policy. As a prerequisite to medication, Washington requires the state to find that a mental disorder exists which requires treatment. *Harper*, 494 U.S. at 222, 110 S.Ct. at 1037–38. The medication must be administered in the patient's medical interest. *Id.* Finally, under Washington law, the patient must be determined to be "gravely disabled" or "pose[ ] a likelihood of serious harm." *Id.*, at 215, 110 S.Ct. at 1033. Washington law defines "gravely disabled" as a condition where a person

(a) is in danger of serious physical harm resulting from a failure to provide for his essential human needs of health or safety, or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

*Id.*, at 216, 110 S.Ct. at 1033.

As is the case under Washington law, Georgia requires that the medication be in the patient's medical interest.[7] Georgia's policy also requires a determination that the patient is "unsafe." The "unsafe" standard is analogous to Washington's requirement that the patient be gravely disabled or pose a likelihood of serious harm.

### Due Process and the Definition of Unsafe

Plaintiffs object that using "unsafe" as a standard for the involuntary administration of psychotropic drugs is unconstitutionally vague. While they do not dispute that the state may medicate a patient when he or she is dangerous to himself or others, they argue that the Constitution requires a more precisely limited definition of "unsafe". Plaintiffs argue that only recent, objectively observable threats or behavior should serve as the basis for forced medication.

The 1994 Georgia Policy defines "unsafe" as "[a] mental state and/or pattern of behavior which assigns a significant risk for actions injurious to self or others." 1994 Policy Memo, § IIC5. The physician testimony in this case reflects the importance of a broad definition of "unsafe" The doctors in the rec-

---

**7.** Some aspects of Georgia law exceed the standards approved in *Harper*. For example, Georgia requires that psychotropic medication is the least restrictive appropriate treatment. Such a standard appears to go beyond those approved in *Harper* but is consistent with dicta in *Riggins*, 504 U.S. at 135, 112 S.Ct. at 1815.

ord concur that a patient is "unsafe" if the patient exhibits potentially dangerous thoughts or behaviors which indicate, or have been indicators of in the patient's past history, a significant risk of injurious or life-endangering conduct. (*See, e.g.,* Brin Deposition, p. 71; Smith Deposition, pp. 51–53; Valdecanis Deposition, pp. 34–36; Nelson Deposition at 49–52; Hester Deposition, pp. 55–57 ). In other words, a patient's impaired thinking or delusional state can render that patient unsafe not to medicate because such state affects his judgment. (*See* Brin Deposition, p. 71; Smith Deposition at 51 & 132; Hester Deposition, at 59–67).[8] For example, Dr. Anita–Rae Smith recalled one patient with a delusion regarding plastic bags who pulled a plastic bag over his head and crawled under the bed. This patient almost died, although he was not violent.

While Plaintiffs seek a more specifically defined standard, Georgia's statute leaves more discretion to the considered professional judgment of Defendants. This exercise of professional judgment does not render the statute unconstitutional. *See Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Moreover, a policy defining only certain conduct as "unsafe" would be difficult and "very ill advised." (Hester Deposition, p. 62–64).

A similarly broad standard was upheld in *Harper.* The standard at issue permitted permitting medication when a likelihood of harm existed, when a patient severely deteriorated in functioning, or when a patient failed to provide for his or her basic needs. *See Harper,* 494 U.S. at 216, 110 S.Ct. at 1033. Given the state's interests in safely running its institution and state's obligation to provide for the medical care of the patients, it is inappropriate for a federal court to intrude too far on state decision making. Accordingly, Georgia's definition of "unsafe" does not unduly burden these Plaintiffs' liberty interests so as to violate due process.

## C) PROCEDURAL DUE PROCESS

Next, the Court must examine what procedural protections are needed to "ensure that the decision to medicate ... [a patient] against his will is neither arbitrary nor erroneous...." *Harper,* 494 U.S. at 228, 110 S.Ct. at 1040. *See generally* Nahmod, § 3.08 at 167. This inquiry requires determining whether the State's nonjudicial mechanisms for the involuntary medication of patients afford due process.

Essentially, procedural due process requires notice, an opportunity to be heard, and an impartial decision-maker. *See McKinney* 20 F.3d at 1561. The test most frequently cited for determining the constitutionality of procedures in a given case is the balancing test found in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). *See Zinermon v. Burch,* 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100. Under this balancing test, the Court must weigh:

[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of an interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest including the function involved and the fiscal and administrative burdens that the additional

---

8. Under hypothetical questioning from Plaintiffs' counsel, Dr. Hester expanded on what behavior might indicate a patient was "unsafe" as follows:

A: [I]in my mind, you see an evidence of the pattern [indicating dangerous behavior] being reexhibited during the emergency. I think that's fairly implicit. It's not talking about someone did something many years in the past and you happen to see them now and you suddenly start involuntary treatment. I don't think that is implied or that anybody reading this could think that. Q: Well let's suppose they had a pattern of behavior that occurred two years ago and it manifests itself on a unit with a doctor, but the patient is not doing anything violent, something physically harmful to himself or others.... Would that assign a significant risk?

...

A: It could in the sense that if that patient has had a very characteristic set of behaviors that has led to violent acts in the past and they start reexhibiting that same set of behaviors that has occurred before they've done violent acts in the past, it would seem to me ... rather than waiting for the absolute violent act to occur, that it would be reasonable that if you've seen this pattern of behavior, to do some sort of intervention based on your assessment of the risk at that time.

(Hester Deposition, pp. 62–63).

or substitute procedural requirement would entail.

*Mathews,* 424 U.S. at 335, 96 S.Ct. at 903.

As discussed above, Plaintiffs possess a significant liberty interest in remaining free from unwanted medication. The current Georgia procedures for ensuring that interest is not interfered with erroneously or arbitrarily are summarized below:

1) The treating physician determines whether the patient is able to consent to medication and seeks consent, either from the patient or from one authorized by law to provide substituted consent.

2) If consent is not given or is unable to be given, the treating physician must determine that administration of psychotropic drugs is in the patient's medical interest, is the least restrictive appropriate treatment, and that the patient is unsafe without medication.

3) Beyond 72–hour emergency treatment, a second physician must concur in the above judgments.

Medication may then be continued for up to thirty days, renewed once, under these procedures.

4) A Status Review is conducted every seven days during involuntary treatment by the treating physician, in consultation with the Treatment Team.

5) To continue involuntary treatment beyond 60 days, a Clinical Review must be held. This Review includes a hearing for which the patient has notice, an opportunity to be heard, and an opportunity to present evidence.

6) The Clinical Review decision may be appealed to the Chief Medical Officer.

7) Review of this decision may be had in the Probate Court.

*Adequacy of Pre–Deprivation Procedures*

In considering the procedures necessary to satisfy due process, one must examine whether predeprivation procedures could address the risk of the particular deprivation involved. *Zinermon,* 494 U.S. at 132–33, 110 S.Ct. at 986–87. Under the Georgia procedure, patients may be medicated either with their consent or pursuant to a single physician medication order in an emergency.

1) Validity of Consent

■ Consistent with due process, a state may not validly accept the consent of a mentally ill person without first determining his or her capacity to consent. *Compare Zinermon,* 494 U.S. 113, 110 S.Ct. 975. As *Zinermon* instructs, dealing with mentally ill patients creates a foreseeable risk that some of the patients may not be competent to consent. *Zinermon,* 494 U.S. at 135, 110 S.Ct. at 988.

Georgia's consent procedures comply with due process.[9] Unlike the statutory scheme in *Zinermon,* Georgia provides for administrative procedures for determining a person's capacity to consent prior to the seeking of such consent. *Compare id.,* at 136, 110 S.Ct. at 989 with Policy Memo § II2A. The Georgia policy requires that the physician, with input from the Treatment Team, assess the patient's capacity to give consent. In making this determination, the physician is required to consider specific factors related to the determination of consent. These facts must be noted in the Clinical Record to provide a basis for later review. If capacity is not present, Georgia has established a procedure for obtaining substitute consent.

2) Single-Physician Medication Orders

In the absence of consent, Georgia allows one doctor to order the medication of a patient. This procedure is allowed only for emergency medication when patients are determined to be "unsafe." At oral argument, Plaintiffs did not contest the need for emergency treatment beyond the definition of "unsafe".

■ A post-deprivation remedy can afford due process when the deprivation is unpredictable or the situation requires the government to act quickly. *See McKinney,* 20 F.3d at 1562–63; *compare Zinermon,* 494 U.S. at 128 & 132, 110 S.Ct. at 984 & 987; *Parratt v. Taylor,* 451 U.S. 527, 538–39, 101 S.Ct. 1908, 1914–15, 68 L.Ed.2d 420 (1981);

9. Plaintiffs do not allege nor argue that the act or process of obtaining substituted consent is un-

constitutional. Thus, the Court will not address further the issue of substituted consent.

*Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The treatment of mentally ill patients necessarily involves a degree of unpredictability. In addition, the state possesses a significant interest in protecting the patients and staff in state-run institutions. Therefore, as long as post-deprivation review is available, Georgia's emergency medication procedures comply with due process. *See Heller,* 509 U.S. at 323–24, 113 S.Ct. at 2644–45; *Addington,* 441 U.S. 418, 429–30, 99 S.Ct. 1804, 1811–12; (*see also* Nelson Deposition, at 49–52).

Additionally, in the case of inpatients, judicial decision-makers have already determined that patients were unsafe to themselves or others through potential violence or inability to care for themselves. *See* O.C.G.A. § 37–3–1(9.1). Courts have held that the probate court determination that a patient requires involuntarily hospitalization is sufficient process to permit the administration of medication without consent. *See Dautremont,* 827 F.2d at 297–98; *Washington,* 805 F.Supp. at 383–84. For example, the Eighth Circuit in *Dautremont* found that the hearing, findings, and court order directing involuntary hospitalization satisfied procedural due process. Accordingly, the court concluded that the patient could be subjected to involuntary medication while an inpatient in a hospital. *Dautremont,* 827 F.2d at 297–98. *But see Rogers v. Okin,* 634 F.2d 650 (1st Cir.1980). The Eighth Circuit's interpretation gains support from the Supreme Court's later decision in *Harper,* which rejected the argument that a finding of incompetency was required prior to forced medication. *See Harper,* 494 U.S. at 222, 110 S.Ct. at 1036–37; *accord Washington,* 805 F.Supp. at 383–84. *But see Harper,* 494 U.S. at 236–37, 110 S.Ct. at 1044–45 (Blackmun, J., concurring). While this Court does not now decide that involuntary committal alone is sufficient due process to overcome Plaintiffs' liberty interest in avoiding medication, the additional medication procedures supplied by state law comply with due process.

### Post-Deprivation Procedures

■ The Post-deprivation procedures afforded under the current Georgia policy are the following: the requirement of a concurring opinion, a status review, the Clinical Review process, appeal from the clinical review, and judicial oversight.

Requiring a second physician to concur with the treating physician's determination within 72 hours decreases the risk of erroneous or arbitrary decisions to medicate. *See Harper,* 494 U.S. at 222 n. 8, 110 S.Ct. at 1037 n. 8 (noting medical ethics require the primacy of patient need); *Zinermon,* 494 U.S. at 138–39, 110 S.Ct. at 989–90. Furthermore, this additional medical opinion provides a safeguard against bias by the initial decision-maker. *Compare McKinney,* 20 F.3d at 1561–63. The status review also insures that the substantive conditions under which Plaintiffs may be lawfully medicated without consent continue to be present.

Finally, a patient may be involuntarily medicated for only a short period of time. This requirement restricts the state's ability to infringe on Plaintiffs' interests without providing the patient an opportunity to be heard. Since the more serious side effects of psychotropic drugs appear only after long-term treatment, the 60–day limit prior to Clinical Review allows a patient to be heard "at a meaningful time and in a meaningful manner." [10] *Compare Washington,* 805 F.Supp. at 385 (180–day treatment orders with interim review do not violate procedural due process).

The Clinical Review process is currently the heart of Georgia's involuntary medication procedures. This review is similar to Washington's internal review process outlined in *Harper.* The members of the Clinical Review Panel may not be involved in the patient's diagnosis and treatment, and therefore, the Georgia procedure provides for neutral decision makers. *Compare Harper,* 494 U.S. at 233–34, 110 S.Ct. at 1043; *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). Furthermore, Plaintiff has presented no evidence that the Clinical Review Panels have an institutional bias. See id. To the contrary, out of ten CSH Clinical Reviews examined in mid–1993, the psychotropic medication of four patients was

---

**10.** *Harper,* 494 U.S. at 235, 110 S.Ct. at 1044.

discontinued following the Review. (Plaintiffs' Exhibit 14 to Elliott Deposition).

Importantly, Georgia's present Policy permits the patient notice of the Clinical Review, an opportunity to present witnesses, the right to be present at the hearing, and the right to assistance from a member of the hospital's Human Rights Committee. *Compare Harper*, 494 U.S. at 235, 110 S.Ct. at 1044. Due process does not require that the patient be represented by a lawyer. *Id.* at 236, 110 S.Ct. at 1044–45. An independent lay adviser, such as a member of the Human Rights Committee in the instant case, is sufficient to afford due process. *Id.*

Finally, Georgia law provides for review of the panel's decision. The Chief Medical Officer of the facility conducts an administrative review. In addition, judicial review can be secured by filing a petition in the appropriate probate court. *Compare Harper*, 494 U.S. at 235, 110 S.Ct. at 1044; *McKinney*, 20 F.3d at 1562.

This review process provides sufficient procedures to protect Plaintiffs' interests while accommodating legitimate state interests. The fact that Georgia does not require minutes of the Review Panel meeting or specifically permit cross examination of witnesses does not deprive patients of minimum due process. *See Parham v. J.R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (due process does not require adversarial hearing to commit mentally ill minor). Defendants evidence suggests that it is important in the patient's treatment for the Clinical Review to remain a medical assessment rather than assume an adversarial character. Cross examination may create an adversarial stance between the patient and the hospital in a situation in which it is important to establish trust and cooperation. Thus, the state has established non-adversarial review process for a legitimate reason. More importantly, [c]ommon human experience and scholarly opinions suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of

mental and emotional illness may well be more illusory than real.

*Harper*, 494 U.S. at 232, 110 S.Ct. at 1042–43 (quoting *Parham*, 442 U.S. at 607–09, 99 S.Ct. at 2506–08).

Some of the additional or substitute procedural safeguards suggested that Plaintiffs suggest would improve the review process. For instance, requiring minutes of the Clinical Review may permit better review upon appeal.

On the other hand, additional procedures would also burden the State's scarce resources. *Cf. Harper*, 494 U.S. at 232, 110 S.Ct. at 1042–43. Procedural due process should adapt to the needs of a particular situation. *See Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Current Georgia policy complies with minimum procedural due process requirements.

Deciding that Georgia's established procedures afford due process does not foreclose all possible procedural due process claims. If Plaintiffs were to establish that Georgia does not follow its adopted procedure, Plaintiffs could have created factual issues regarding whether their procedural due process rights were being violated. *See e.g., Zinermon*, 494 U.S. at 124, 110 S.Ct. at 982 (S 1983 provides "a federal remedy 'where the state remedy, though adequate in theory, was not available in practice.'") (quoting *Monroe v. Pape*, 365 U.S. 167, 173–74, 81 S.Ct. 473, 476–78, 5 L.Ed.2d 492 (1961)). However, Plaintiffs presented no evidence of a custom or policy that state actors ignore the procedural requirements. In fact, after a careful review of the record, the Court could locate no probative evidence that the CSH doctors did not comply with state policy.[11]

*Judicial v. Medical Decision–Makers*

■ Georgia's pre-deprivation and post-deprivation procedures depend on decisions made by medical professionals. Plaintiffs suggest that the decision to administer drugs against their will should not be made by a physician and should be made only by a

---

11. Any claim that named Plaintiffs were denied procedural due process in individual cases will be addressed *infra* § IV. *See Geller v. Staten*

*Island Developmental Ctr.,* 1991 WL 99054 (N.D.N.Y.1991) (unreported).

court. However, due process does not require that the pre-deprivation fact finder be a judicial officer. Under *Parham v. J.R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), and *Youngberg*, a physician can serve as the neutral fact finder required by due process. *See Parham*, 442 U.S. at 614, 99 S.Ct. at 2510; *Youngberg*, 457 U.S. at 321–22, 102 S.Ct. at 2461–62 (procedural due process satisfied by the "exercise of professional judgment"); *accord Harper*, 494 U.S. at 231–32, 110 S.Ct. at 1041–43. Therefore, for decisions which require specialized knowledge, the demands of the Fourteenth Amendment are met when the decision maker is a person qualified by "education, training, or experience to make the particular decision at issue." *Youngberg*, 457 U.S. at 323 n. 30, 102 S.Ct. at 2462 n. 30.

The Supreme Court has further stated that "challenges to conditions in state institutions" must receive "limited judicial review" through deference to professional judgment. *Youngberg*, at 322, 102 S.Ct. at 2461. Such deference is warranted due to the inherent uncertainty of the diagnosis and treatment of mental illness. *See e.g. Heller v. Doe*, 509 U.S. 312, 323–24, 113 S.Ct. 2637, 2644–45, 125 L.Ed.2d 257 (1993); *Harper*, 494 U.S. at 236, 110 S.Ct. at 1044–45 (Blackmun, J. concurring); *Addington*, 441 U.S. at 429–30, 99 S.Ct. at 1811–12. Thus, in medical decisions, deference is due the opinions of those skilled in the diagnosis and treatment of mental illness. *Cf. id.; see also Youngberg*, 457 U.S. at 322, 102 S.Ct. at 2461; *Harper*, 494 U.S. at 231, 110 S.Ct. at 1041; *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 330, 105 S.Ct. 3180, 3194, 87 L.Ed.2d 220 (1985).

Plaintiffs complain that deferring to the judgment of individual professionals produces arbitrary decisions. They point to a lack of uniformity among physicians in finding certain patients "unsafe" and claim that these disagreements reflect random decision making.

Defendant doctors admit that opinions of individual physicians may differ as to whether a particular patient is actually unsafe at a given time. (*See* Brin Deposition, pp. 108–14; Smith Deposition pp. 51 & 129). However, although doctors' opinions may sometimes differ, Plaintiffs' have produced no evidence that a judicial fact-finder would be more consistent. *Cf. Harper*, 494 U.S. at 235 n. 13, 110 S.Ct. at 1044 n. 13. *See supra.* The determination of whether a patient is unsafe requires an informed medical judgment more than sound legal judgment. Accordingly, in deciding whether a patient should receive medication involuntarily, it is appropriate to defer to the judgment of those expert in the diagnosis and treatment of mental illness.

Plaintiffs contend that the *Harper* and *Riggins* decisions reject deference to professional judgment.[12]

This Court disagrees. *Riggins* discusses only substantive due process and does not address procedural due process. *Cf.* 504 U.S. at 139, 112 S.Ct. at 1817 (Kennedy, J. concurring). *Riggins* thus provides no guidance into the procedures required once it has been determined that the state may constitutionally infringe upon Plaintiffs' liberty interest. Likewise, *Harper* does not alter the standard of professional deference in procedural protections. *Harper* merely states that due process is "satisfied" by "allowing the decision to medicate to be made by medical professionals." *Harper*, 494 U.S. at 231, 110 S.Ct. at 1042. A judicial determination of the necessity to administer the drug is not required. *Id.* Therefore, due process under *Harper* is not violated by the use of "informal, traditional medical investigation techniques." *Id.*, at 232, 110 S.Ct. at 1042.

## D) INFORMED CONSENT AND PROCEDURAL DUE PROCESS

Plaintiffs assert a right to "adequate informed consent" pursuant to the Fourteenth Amendment to the Constitution. Plaintiffs argue that, even if they consent to antipsy-

---

12. Plaintiffs also rely here on the decision in *Woodland v. Angus*, 820 F.Supp. 1497 (D.Utah 1993). However, *Woodland* is of little value in the present analysis for several reasons. First, *Woodland*, like *Riggins* deals with issues of substantive, rather than procedural, due process.

Second, *Woodland's* facts are closer to those in *Riggins* than those in the instant case. Accordingly, *Woodland* does not add anything to the present discussion which is not addressed by *Riggins*.

chotic medication, such consent is constitutionally invalid, because they did not receive adequate information about the risks and benefits of the drugs. The cases upon which Plaintiffs rely, however, suggest that the doctrine of informed consent arises from state medical malpractice law rather than constitutional law. *See Canterbury v. Spence,* 464 F.2d 772, 780 nn. 12 & 13 (D.C.Cir.1972); *Cruzan,* 497 U.S. at 276–77, 110 S.Ct. at 2850–51; *Woodland,* 820 F.Supp. at 1505.

The constitutional issue of "informed consent" in this case relates to the **waiver** of rights. In order to consent, Plaintiffs must waive their liberty interest in refusing antipsychotic medication. Any waiver of a constitutional right must be a knowing and voluntary. *See e.g., Dunkins v. Thigpen,* 854 F.2d 394, 398 (11th Cir.1988).

█ Plaintiffs argue that state policy does not provide sufficient information to permit a competent patient to exercise an informed choice. Plaintiffs have supplied no evidence that the failure to provide adequate information is the result of any state custom, practice, or policy. In fact, the 1994 Policy specifically provides that the risks and benefits of psychotropic medication must be explained to the patient before consent is obtained. *See supra* § ID. Further, the record reflects that information on medication is made available to patients according to CSH policy and practice. *Id.* Therefore, any failure to adhere to the Policy would be a random and unauthorized deprivation of Plaintiffs' rights. *Cf. McKinney,* 20 F.3d at 1562–63.

Physicians are presumed in the absence of contrary evidence to carry out their medical mission to the patient's benefit. *See Harper,* 494 U.S. at 222 n. 8, 110 S.Ct. at 1037 n. 8. Accordingly, Georgia cannot predict which of its medical personnel may fail to follow its policy to provide information regarding the risks and benefits of psychotropic medication. For those unpredictable deviations from policy, Georgia law provides remedies in tort for failure to provide informed consent. *See Holbrook v. Schatten,* 165 Ga.App. 217, 299 S.E.2d 128 (1983); *Bendiburg v. Dempsey,* 909 F.2d 463 (11th Cir.1990), cert. denied 500 U.S. 932, 111 S.Ct. 2053, 114 L.Ed.2d 459 (1991). Such a remedy can compensate a patient for the loss suffered. *Cf. McKinney,*

20 F.3d at 1564; *Parratt,* 451 U.S. at 544, 101 S.Ct. at 1917.

Georgia's informed consent procedure is not constitutionally defective. Based on the record in this case, the failure to provide sufficient information to permit a knowing and voluntary choice would be an unauthorized and unpredictable deprivation. Therefore, additional predeprivation procedures would not likely reduce the instances of such deprivations, and therefore post-deprivation procedures can provide due process. *See Parratt,* 451 U.S. at 538–41, 101 S.Ct. at 1914–16. Georgia tort law provides an adequate post-deprivation remedy. *Cf. Hudson,* 468 U.S. at 533–35, 104 S.Ct. at 3203–05; Parratt, 451 U.S. at 543, 101 S.Ct. at 1917; *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *Zinermon,* 494 U.S. at 128, 110 S.Ct. at 984.

## IV: DAMAGES

### A) Status of Damage Claims

█ The remaining damage claims are by named Plaintiffs against Defendants in their individual capacities. The Order certifying the class required the named Plaintiffs to intervene with damage claims. Defendants argue that Plaintiffs have taken no action to intervene and have thus waived the damage claims raised in the Complaint.

When a class is certified only for equitable relief, however, the damage claims remain as incidental to the class litigation. *See Nix v. Grand Lodge Int'l Assoc. of Machinists & Aerospace Workers,* 479 F.2d 382, 386 (5th Cir.1973). Plaintiffs asserted damages in the Complaint, and therefore, requiring formal intervention would have been a needless formality.

Accordingly, the named Plaintiffs' damage claims remain as part of the litigation. These claims are so-called "as applied" due process challenges. *See McKinney,* 20 F.3d at 1557 n. 9. An "as applied" substantive due process claim focuses on whether the actual decision to apply the statutes permitting forced medication to an individual Plaintiff was arbitrary and capricious. *See id.; Restigouche* 59 F.3d at 1212. Any claim of a "legislative" due process violation is foreclos-

ed by the Court's holdings *supra*. Thus, the Court will only address the substantive and procedural process used in medicating the named Plaintiffs under the 1986 Policy.

### B) Qualified Immunity

Defendants assert the defense of qualified immunity. Qualified immunity protects government officials performing discretionary functions from personal liability under federal law if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The *Harlow* standard evaluates an official's actions against clearly established law and provides broad qualified immunity to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

■ To establish qualified immunity on summary judgment, a public official has the initial burden of showing that he acted within the scope of his discretionary authority. *See Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir.1983). The burden then shifts to the plaintiff to demonstrate that the official's actions violated clearly established law, *Id.* In the instant case, there is no dispute that Defendants acted within the scope of their authority. Accordingly, Plaintiffs must show that (1) the law governing Defendants' actions was clearly established, and (2) viewing the evidence in Plaintiffs' favor, Defendants' acts violated that law.

### Clearly Established Law

■ Generally, if the law was not "clearly established" at the time of the alleged violation, the official is entitled to summary judgment. *Ansley v. Heinrich*, 925 F.2d 1339, 1348 (11th Cir.1991). On the other hand, if the law was clearly established, the qualified immunity defense ordinarily should fail. *Harlow*, at 817–19, 102 S.Ct. at 2738. The law is "clearly established" when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). In the Eleventh Circuit, this standard demands

that the official have crossed a "bright line". "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Post v. Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993); *see also Malley*, 475 U.S. at 341, 106 S.Ct. at 1096 ("[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized."). "This analysis focuses on the state of the law at the time of the alleged violation." *Leeks v. Cunningham*, 997 F.2d 1330, 1333 (11th Cir.1993).

### 1) Substantive Due Process

Plaintiffs rely on *Harper* and *Riggins* as clearly establishing a right to refuse anti-psychotic medications. However, *Harper* and *Riggins* did not purport to establish minimum constitutional standards. *See supra*. Moreover, *Harper* and *Riggins* were decided in a criminal, rather than civil context. Even though *Harper* and *Riggins* recognize a liberty interest in the right to refuse anti-psychotic medication, those cases do not address the circumstances under which a patient in a mental hospital may be deprived of this interest. Thus, the factual specificity required to establish a bright line is not necessarily present. The Court will assume, however, that the cases cited by Plaintiffs are sufficiently similar and examine whether Defendants complied with the substantive standards which those cases imply.

In *Riggins*, a pre-trial detainee who was prescribed massive doses of the antipsychotic drug Mellaril during trial challenged the constitutionality of his conviction. The Supreme Court addressed the narrow question of whether "involuntary administration of Mellaril denied him a full and fair trial" in violation of the Sixth Amendment. *Riggins*, at 133, 112 S.Ct. at 1814. The *Riggins* Court found that the Fourteenth Amendment requires the state to "establish the need for . . . and the medical appropriateness of the drug." *Riggins*, at 135, 112 S.Ct. at 1815.

Similarly, *Harper* held that involuntary medication did not violate a prisoner's right to due process where the state had determined that medication was in his best medical interest and that he was gravely disabled or dangerous. *See* 494 U.S. at 220–24, 110

S.Ct. at 1036–38. Thus, qualified immunity should shield Defendants where a reasonable government officer under the circumstances could have believed that medication without consent was medically appropriate and the patient was unsafe.[13] *See Post,* 7 F.3d at 1558; *Moore v. Gwinnett County,* 967 F.2d 1495, 1497 (11th Cir.1992).

■ Defendants appear to have met those standards in administering psychotropic medication to the named Plaintiffs in this case. Plaintiffs were medicated upon doctors' orders and pursuant to a prescription. Therefore, it appears that the medication of Plaintiffs was deemed to be medically appropriate. *See Harper,* 494 U.S. at 222, 110 S.Ct. at 1036–37. Furthermore, according to the record, prior to ordering psychotropic medication for the named Plaintiffs, Defendant physicians also determined that Plaintiffs were unsafe. After a thorough search of the record[14], the Court can locate no evidence which shows or suggests that accepted professional judgment was not exercised in the determination that the named Plaintiffs were unsafe. *(See, e.g.,* Elliot # 1 Deposition at 61; Brin Deposition at 110–11; Smith Deposition at 51; Grant Deposition at 122). In fact, the record reflects that more than one physician determined the named Plaintiffs were unsafe and required antipsychotic medication. The concurring opinions further strengthen the conclusion that the decision to medicate was made within the bounds of professional judgment.

Finally, given the medical history and psychological background of the named Plaintiffs, no evidence suggests that it was unreasonable for Defendants to have believed Plaintiffs were unsafe. For example, Plaintiff Hightower repeatedly injured himself through his disruptive behaviors. These disruptive episodes were connected to the amount of medication he received. Plaintiff Ruff displayed hostility and had in the past threatened to kill his mother. Plaintiff Butts displayed a tendency to harm herself by re-

fusing to eat and to harm others by pushing a staff member. Defendant Smith's uncontradicted testimony was that Plaintiff Shepard's delusional state impaired her thinking to the point that she could pose a danger to herself or others. Plaintiff Shepard has not presented any medical testimony stating that she was not delusional at the time she was involuntarily medicated.

Plaintiffs have failed to establish that, under the circumstances, a reasonable physician would not have believed that the appropriate substantive standards were present in the instant case. Therefore, the individual Defendants are entitled to qualified immunity for Plaintiffs' claims of substantive due process.

### 2) Procedural Due Process

In order for Plaintiffs to avoid the qualified immunity defense to their procedural due process claims, the case law must have clearly established that certain procedural protections were required by the federal constitution. The case that is the most factually similar to this case is *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)(mentally retarded man involuntarily committed to a state institution for training and habilitation); *see also Leeks,* 997 F.2d at 1334. *Riggins* does not address procedural requirements at all. *See* 504 U.S. at 139, 112 S.Ct. at 1817 (Kennedy, J. concurring). However, *Harper* may be sufficiently analogous to alert Defendants that the procedures required therein should be followed.

The pre-deprivation process provided for in *Youngberg* was simply "that professional judgment was in fact exercised." *Id.,* at 321 & 323 n. 30, 102 S.Ct. at 2461 & 2462 n. 30; *see also Harper,* 494 U.S. at 222 & 233, 110 S.Ct. at 1037 & 1043. Such pre-deprivation process was arguably provided in the instant case. *See Malley,* 475 U.S. at 341, 106 S.Ct. at 1096; *Post,* 7 F.3d at 1558. While Plaintiffs may disagree with the doctor's opinions

---

13. This Court has determined that Georgia's "unsafe" requirement is substantially equivalent to Washington's requirement that the inmate be "gravely disabled or dangerous." *See supra.*

14. This Court notes that it is not the Court's obligation to search the record to determine

whether a fact question exists. It is Plaintiffs' obligation to point to such facts in the extensive record created in this case. *Restigouche Inc. v. Town of Jupiter, Fla.,* 59 F.3d 1208, 1213 (11th Cir.1995).

that they were "unsafe" or that medication was appropriate, the affidavits of physicians which disagree that medication was appropriate for particular Plaintiffs merely reflect a difference of opinion by professionals, not that professional judgment was not exercised at all.

*Harper* noted that an internal committee was provided under the Washington scheme to review medication decisions. Thus, the question becomes whether it was clearly established that a reasonable physician should have provided the named Plaintiffs a "hearing before a special committee." *See* 494 U.S. at 215, 110 S.Ct. at 1033.

■ This Court determines that *Harper* did not clearly establish the right to a "hearing before a special committee". First, as discussed above, *Harper* does not establish the minimum standards required under the Constitution. Instead, the Court in *Harper* merely approved the procures that the state of Washington used. *See* 494 U.S. at 233, 110 S.Ct. at 1043. Plaintiffs argue that Defendants believed that *Harper* mandated certain procedures. However, qualified immunity is an objective test, and thus Defendant's subjective beliefs are largely irrelevant. *See Leeks*, 997 F.2d at 1333. The issue is not whether Defendants actually believed that *Harper* mandated certain procedures, but whether a reasonable public official would have known that *Harper* required internal review by a committee, rather than simply by a second physician with the opportunity to obtain judicial review.

Second, the Supreme Court held that the review process approved in *Harper* "addressed to our satisfaction" the "independence of the decisionmaker." 494 U.S. at 233, 110 S.Ct. at 1043. Due process is satisfied where the process insures that a decision is relatively free from bias. *See McKinney*, 20 F.3d at 1561. The 1986 Georgia policy provided for an independent "review" of the original decision to medicate by another physician. Plaintiffs present no probative evidence that an independent review did not actually occur. Therefore, as the Court held in *Harper*, "[i]n the absence of record evidence to the contrary, we are not willing to presume that members of the staff lack the necessary independence to provide [a patient with an independent review]." *See Harper*,

494 U.S. at 233, 110 S.Ct. at 1043. Such a review, although by a single physician, helps to reduce potential bias in making a medication decision. *See McKinney*, 20 F.3d at 1562.

Finally, the *Harper* court noted that, under state law, an inmate could obtain judicial review of the medication decision through a petition. *Id.*, at 235, 110 S.Ct. at 1044. Georgia law furnishes such a procedure. Judicial review provides Plaintiffs with an opportunity to be heard, to further challenge the decision as biased, and to cure due process violations. *McKinney*, 20 F.3d at 1562–63.

For the foregoing reasons, Defendants are entitled to qualified immunity for alleged procedural due process claims. It is important to stress that this determination might be different if Plaintiffs had produced competent evidence of failures to follow the 1986 Policy in medicating the individual Plaintiffs. However, the failure to produce such evidence is fatal to their federal damage claims.

C) Official Immunity From State Law Damage Claims

Plaintiffs have also sued Defendants in their individual capacities for damages under Georgia law. Federal law qualified immunity does not address the question of damages under state law. However, although not directly briefed by either party, parties implicitly have raised the issue of official immunity for any state-law damage claims in Counts Eight and Nine.

■ Official immunity (analogous to federal-law qualified immunity) may shield from liability a governmental actor sued in his individual capacity. State officers and employees and those of its departments and agencies may be sued only for "ministerial functions" not performed or negligently performed or for "official functions" performed with actual malice or intent to injure. Ga. Const. Art. I, § II, IX(d); *Gilbert v. Richardson*, 264 Ga. 744, 753, 452 S.E.2d 476 (1994); *Coffee County School Dist. v. Snipes*, 216 Ga.App. 293, 454 S.E.2d 149 (1995), Cert. Den. Official functions are those within the actor's scope of authority, whether ministerial or discretionary. *Gilbert*, 264 Ga. at 753, 452 S.E.2d 476.

Plaintiffs do not dispute that Defendants' actions were performed within their discretionary authority. Their acts in relation to Plaintiffs were official functions. Accordingly, Plaintiffs may avoid summary judgment only by presenting significant, probative evidence demonstrating actual malice or intent to injure. *See Fitzpatrick*, 2 F.3d at 1115; Ga. Const. Art. I, § II, IX(d); *Gilbert*, 264 Ga. at 753, 452 S.E.2d 476.

Plaintiffs do not make such an argument. Nor do they point to any such evidence in the record. After a careful review of the record, the Court can locate no evidence which indicates that Defendants' actions were the result of intentionally harmful or malicious conduct. Therefore, the individual Defendants are entitled to official immunity from claims for tort damages under Georgia law.

## V: CONCLUSION

Accordingly, Plaintiffs motion to correct clerical mistake is **GRANTED.** Fed.R.Civ.P. 60(a). The style of the case should now read "Tommy Olmstead in his official capacity as Commissioner of the Georgia Department of Human Resources, et al."

Defendants' Motion for Summary Judgment [# 93] is **GRANTED.** The Clerk is **DIRECTED** to enter judgment accordingly.