926 F.2d 532
 Leisa GIBSON, Plaintiff-Appellant,
v.
Robert MATTHEWS, Warden, Federal Correctional Institution,
Individually and in his Official Capacity; William Ellis,
M.D., Individually and in his Official Capacity; Edgar Sim,
Individually and in his Official Capacity; Tim Picard,
Individually and in his Official Capacity; Stanley E.
Morris, Director, U.S. Marshals Service, in his Official
Capacity; Ten Unknown Named Agents, U.S. Marshals Service,
Individually and in their Official Capacities, Defendants-Appellees.
 No. 89-5284.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 8, 1989.
Decided Feb. 22, 1991.
 
 David A. Friedman, Sara L. Pratt (argued), American Civil Liberties Union of Kentucky, Louisville, Ky., for Leisa Gibson.
 Louis DeFalaise, U.S. Atty., Marianna J. Read, Asst. U.S. Atty., Lexington, Ky., John Cordes, Lowell V. Sturgill, Jr. (argued), Dept. of Justice, Appellate Staff, Civil Div., Marianne Finnerty, Trial Atty., U.S. Dept. of Justice, Jay S. Bybee, U.S. Dept. of Justice, Civil Div., Barbara L. Herwig, U.S. Dept. of Justice, Appellate Staff, Civil Div., Washington, D.C., for defendants-appellees.
 Before MILBURN and BOGGS, Circuit Judges, and ENGEL, Senior Circuit Judge.
 BOGGS, Circuit Judge.
 
 
 1
 Leisa Gibson, a formerly pregnant bank robber serving time in federal prison, has sued numerous federal officials, stating that she wanted to have an abortion and was not enabled to do so as a result of the actions of different federal officials. She contends that these actions violated her rights under the fifth, eighth and ninth amendments to the Constitution, and thus constituted a violation of 42 U.S.C. Sec. 1983. The district court construed her allegations in the manner most favorable to her, but nevertheless granted defendants summary judgment. 715 F.Supp. 181 (1989). We AFFIRM the district court's grant of summary judgment for the defendants because we agree with the district court that Gibson's complaint does not state a constitutional violation, and we also hold that the defendants are entitled to qualified immunity.
 
 
 2
 * Gibson was convicted of robbery in federal district court on January 28, 1986. The undisputed part of Gibson's story begins while she was in the Harris County, Texas, Jail, awaiting sentencing. She wrote letters on April 16, 1986 to the federal public defender and on April 24, 1986 to the district judge who would sentence her. In each letter she specifically indicated a desire to terminate her then existing pregnancy. In the letter to the public defender, she indicated that she was then "13-14 weeks" pregnant, which would indicate a conception date in mid-January and a probable delivery date in mid-October of that year.
 
 
 3
 Thereafter, according to Gibson, she made repeated requests of virtually everyone that she came in contact with for assistance in carrying out the abortion, but was thwarted at every turn. For the purposes of this appeal from a grant of summary judgment, we will consider the issues strictly assuming that her version of these events is correct.[1]
 
 
 4
 According to Gibson, she had various dealings with United States Marshals while still in custody in Texas before and after sentencing. She asked them on each occasion to help her procure an abortion. She also asked various jail nurses and a female jail officer for help, all of whom referred her to the Marshals.
 
 
 5
 She was sentenced on May 16, and the federal judge requested information on when she would be moved to a federal prison and asked that the abortion be carried out as soon as possible.
 
 
 6
 On June 10, after a several day trip through various federal prison facilities in Oklahoma and Georgia, Gibson arrived at Alderson Prison in West Virginia, and dealt with several medical personnel there. She was told that no abortions were performed there, and that she would have to go to the prison in Lexington, Kentucky for an abortion.
 
 
 7
 On June 17, she arrived at the Federal Correctional Institution in Lexington, and was examined the same day by two physician's assistants, who told her that her pregnancy was too far along for an abortion. An appointment with a doctor was apparently scheduled for June 20, but she did not keep the appointment because she was not informed of it.
 
 
 8
 On June 28, according to Gibson (the medical records indicate June 26), she met with Dr. Ellis, who informed her that it was too late to have an abortion at that time. Gibson's affidavit also alleges that she told a prison chaplain, counselors and a psychiatrist of her desire for an abortion. She can provide a specific name for only one of these persons, Beatrice Martin, who is not named as a defendant.
 
 
 9
 Gibson has now sued the following individuals based on the following theories:
 
 
 10
 1. Dr. Ellis, for not having helped her have the abortion;
 
 
 11
 2. Edgar Sim and Tim Picard, two physician's assistants, who met with the plaintiff on June 17 and did not assist her in having the abortion;
 
 
 12
 3. Robert Matthews, the warden of the Lexington Federal Correctional Institution, for failure to train and supervise those at FCI Lexington;
 
 
 13
 4. Stanley Morris, the Director of the United States Marshals Service, only in his official capacity;
 
 
 14
 5. Ten unnamed and otherwise unspecified marshals, presumably those who had some contact with her during her transportation through the federal prison system.
 
 
 15
 The district court dismissed the case as to all defendants. It appears that an appeal was not prosecuted with regard to Morris, and the "unnamed marshals" have never been specified or even described, nor has any evidence been shown that they are amenable to service in the district in which Gibson filed her suit.[2]
 
 
 16
 The suit against Morris was dismissed because he was sued only in his official capacity, and such a suit was equivalent to a suit against the United States and thus barred by sovereign immunity. The other officials were sued both in their individual and official capacity, and the official capacity suits were similarly dismissed. Thus, the only defendants before us are the warden (Matthews), the doctor (Ellis) and the assistants (Sim and Picard), in their individual capacities.
 
 
 17
 Although it may appear from the facts that Gibson was a victim of the bureaucracy as a whole and that no person took care to see that her situation was dealt with, rather than "passing the buck," this theory cannot suffice to affix personal liability on any of the defendants. If any one of them is to be held liable, it must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others, either defendants or non-defendants.
 
 
 18
 Thus, we must focus on the action of each defendant in turn. Continuing to take the facts as stated by Gibson and in the light most favorable to her, the following are the actions taken by each defendant.
 
 
 19
 Sim and Picard met with her the same day she arrived at Lexington, having had no responsibility for her failure to arrive any sooner, and told her that they believed that it was too late for an abortion. Based on the time table established by Gibson herself in the letter to the public defender, she was now 22 to 23 weeks pregnant. They did schedule an appointment with Dr. Ellis within three days, and she actually met with Ellis nine days later, on June 26. Dr. Ellis saw her, and informed her that he could not arrange an abortion, because it was "too late."
 
 
 20
 Warden Matthews had no involvement in the above events, and met with Gibson only one time, after she had given birth. There is no indication that Matthews was in fact aware of Gibson's condition or even her presence during the events in June, nor that he had any communication of any type with Ellis, Sim, or Picard concerning pregnancy or abortions.
 
 II
 
 21
 We uphold the district court's judgment in part because we believe that the defendants are entitled to qualified immunity under the doctrine established in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Supreme Court in Harlow held that an official action does not give rise to a cause of action unless any reasonable government official would know or reasonably should have known that the action would violate a clearly established constitutional right. Harlow, 457 U.S. at 818, 102 S.Ct. at 2738; Dominque v. Telb, 831 F.2d 673, 676 (6th Cir.1987). We do not believe that it was a clearly established constitutional right at the time of the alleged actions regarding Gibson that federal prison employees were required to facilitate prisoners in their requests for an abortion.
 
 
 22
 At the time these events took place, there were no reported cases regarding the abortion rights of prisoners. The Third Circuit, in Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326 (3d Cir.1987), subsequently struck down a county policy requiring a court order before prisoners could have an abortion, and implicitly extended to prisoners a right not to be prevented from having an abortion because of their incarcerated status. Since that time, only one other case has dealt with the issue. That case, Bryant v. Maffucci, 729 F.Supp. 319 (S.D.N.Y.1990), upheld a grant of summary judgment for defendants when a prisoner's scheduled abortion was not performed because the pregnancy was of 24 weeks duration and abortions could not legally be performed in the third trimester.
 
 
 23
 In 1986, at the time of the events in this case, federal prison policy stated that prisoners should be required to execute a form taking responsibility for a decision either to have an abortion or carry a pregnancy to term. 28 C.F.R. Sec. 551.23. A bar on federal payment for inmate abortions was mandated by statute in 1986. Pub.L. No. 99-500, Title II, Sec. 209, 100 Stat. 1783-56.
 
 
 24
 Under these circumstances, the defendants are entitled to summary judgment on the issue of qualified immunity. See Russ' Kwik Car Wash v. Marathon Petroleum Co., 772 F.2d 214 (6th Cir.1985). In 1986, there simply was no ruling or consensus on the issue of whether a prison was required to furnish or arrange abortion for inmates. The Monmouth decision itself refers to the question as "a novel constitutional decision." Monmouth, 834 F.2d at 355 (Mansmann, J., concurring). While a prisoner does not lose all constitutional rights within prison, Bell v. Wolfish, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979), a large number of rights are significantly curtailed because of the fact that the prisoner is not at physical liberty to make arrangements that would be possible were the prisoner able to travel in the community.
 
 
 25
 It was also not clearly established that the fifth amendment required prison officials to accommodate prisoners desiring to have abortions. The Supreme Court had ruled in both Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), and Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), that the government was not under an obligation to facilitate abortions, either by explicitly funding them for poor women or by providing abortion funding in state welfare programs. Other cases have held that the government cannot restrict access to abortions, but in those cases the government acted wholly in a prohibitory manner, rather than simply failing to act. The actions that Gibson thinks the prison officials should have performed fall, in our opinion, closer to a failure to act than a prohibition. Accordingly, in light of Maher and Harris, we believe that there was no clearly established constitutional right of a prisoner under the fifth amendment to require the aid of prison officials in procuring an abortion.
 
 
 26
 Even if we were to conclude that the holding of Monmouth and the import of the prison regulations were clearly established constitutional law prior to 1986, there is no indication that Ellis, Sim, or Picard did anything other than exercise their honest medical judgment. We do not believe that the defendants should have known that their belief that it was too late to procure an abortion violated Gibson's constitutional rights. By Gibson's own letter, she was 22 to 24 weeks pregnant by the time these events took place, a time at which virtually no abortions are performed in the United States. See National Center for Health Statistics, Monthly Vital Statistics Report, Jan. 5, 1990 (only 1.2% of abortions are performed after the 21st week of pregnancy); Amicus Brief of American Medical Association, et al., for Appellees, Webster v. Reproductive Health Services, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (No. 88-605) (only 1% of all abortions are performed after the 20th week of pregnancy). She herself had, more than ten weeks earlier, indicated that an abortion, if it were to be performed, should be performed in the next three to five weeks. Under these circumstances, we do not believe that every reasonable official should have known that he or she was violating the constitution by acting toward Gibson as each defendant did act. Dominque, 831 F.2d at 676.
 
 III
 
 27
 We would uphold the district court even if qualified immunity was not available. Plaintiff presents three separate constitutional sources as indicating that the right to have an abortion would have been considered clearly established. Even taking her allegations as true, none of them supports her contention that the defendants' actions toward her rose to the level of a constitutional violation.
 
 A. The Eighth Amendment
 
 28
 There is no indication in the holding or even language of any case prior to Monmouth that failure to arrange an abortion would be considered "deliberate indifference to serious medical needs," the standard established in Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) as the standard for eighth amendment violations. Even if we presume that the defendants should have known before Monmouth that an abortion was a "serious medical need" within the meaning of Estelle, we do not see how the defendants' actions could be viewed as "deliberate indifference" to that need. Defendants paid prompt and serious attention to her needs as soon as each of them became aware of her desire for an abortion. The delay in attending Gibson which resulted in her inability to have the abortion was in large part due to the delay in transporting her to the Lexington facility, actions beyond the control of the defendants. Their considered opinion that it was too late to arrange an abortion is reasonable in light of the very small number of abortions actually performed after the 24th week of pregnancy. We agree with the district court that, at most, the actions here amounted to negligence, although it is not even alleged that the medical personnel were exercising anything other than their best medical judgment or that such judgment was incorrect. Accordingly, Gibson's eighth amendment claim is denied.
 
 B. Fifth Amendment Substantive Due Process
 
 29
 Defendants' actions also do not violate the fifth amendment's substantive due process clause. The Supreme Court has held, in Daniels v. Williams, 474 U.S. 327, 330-31, 106 S.Ct. 662, 664-65, 88 L.Ed.2d 662 (1985), that mere negligent conduct by a government official could not serve as a deprivation of an individual's liberty interest under the due process clause. As we have noted earlier, the defendants' actions can at best be described as negligent. While reckless or arbitrary deprivation of a liberty interest can also give rise to a fifth amendment violation, Nishiyama v. Dickson County, Tennessee, 814 F.2d 277 (6th Cir.1987) (en banc), we do not believe that the defendants' actions rise to that level either.
 
 
 30
 Nishiyama involved the death of a young woman, Kathy Nishiyama, through the grossly negligent acts of the Dickson County Sheriff's Department. The Department permitted a convicted felon, Charles Hartman, to drive a marked and fully equipped patrol car without a police officer present. On the night in question, deputies of the Department told Hartman that he should drive a patrol car back to the jail, unattended, for the personal convenience of the deputies. During this "return trip," Hartman used the flashing blue lights to stop the victim, whom he then beat to death.
 
 
 31
 We held in Nishiyama that an official triggered a Sec. 1983 claim if he or she "intentionally does something unreasonable with disregard to a known risk ... and of a magnitude such that it is highly probable that harm will follow." Nishiyama, 814 F.2d at 282. This obviously means that the official must be able to have undertaken another action to prevent the harm without that other action producing an offsetting danger or complication. Here, the lateness in term provided a complication that Gibson's suggested course of action could not have avoided. By analogy to Nishiyama, giving Hartman the patrol car when the alternative was simply to procure another ride or call another car to bring deputies out to supervise Hartman was an easy case. The alternative raised no risk of an alternative harm or complication. Giving Hartman the same car in a different situation, such as if it had been necessary to have Hartman drive a critically injured accident victim to a hospital, would pose an entirely different question.
 
 C. Ninth Amendment
 
 32
 We agree with the district court that the ninth amendment does not confer substantive rights in addition to those conferred by other portions of our governing law. The ninth amendment "was added to the Bill of Rights to ensure that the maxim expressio unius est exclusio alterius would not be used at a later time to deny fundamental rights merely because they were not specifically enumerated in the Constitution." Charles v. Brown, 495 F.Supp. 862, 863-64 (N.D.Ala.1980). Accordingly, Gibson's ninth amendment claim holds no merit.
 
 D. Violation of Federal Regulation
 
 33
 At this time a federal regulation stated that prison officials should assist in procuring an abortion for prisoners who desired one. 28 C.F.R. Sec. 551.23. However, in the language of Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), and Washington v. Starke, 855 F.2d 346 (6th Cir.1988), this regulation did not use "language of an unmistakably mandatory character" with "specified substantive predicates." Thus, official discretion may be employed. See Hewitt, 459 U.S. at 471-72, 103 S.Ct. at 871-72. The regulations merely indicated that certain assistance should be given to prisoners, analogous to the regulations requiring prison officials to provide reading materials to prisoners at the prisoners' request. 28 C.F.R. Sec. 541.21(8). The regulations clearly place the responsibility for having an abortion on the prisoner. 28 C.F.R. Sec. 581.23(a) (1986). The regulations are clear that "[a]n inmate shall sign a statement of responsibility for the decision to have an abortion or to bear the child." 28 C.F.R. Sec. 551.23(c) (1986). The inmate is required to give the staff direction "to arrange for the abortion to take place at a hospital or clinic outside the institution." 28 C.F.R. Sec. 551.23(d) (1986). A regulation creates a protected liberty interest only if it is couched in such mandatory terms that "a plaintiff 'must have a legitimate claim of entitlement to that interest, not simply a unilateral expectation of it.' " Starke, 855 F.2d at 349, quoting Bills v. Henderson, 631 F.2d 1287, 1292 (6th Cir.1980). We do not believe that these regulations at issue are so mandatory that Gibson could believe that the defendants were required, absent clear direction from her, to facilitate her abortion.
 
 IV
 
 34
 We therefore find no error in the actions of the trial court, and AFFIRM the summary judgment for all defendants based on the failure of Gibson's complaint to state a constitutional violation and on the defense of qualified immunity.
 
 
 
 [1]
 We note for the record, however, that virtually every official with whom she dealt disputes her version of these events: the Alderson medical records show no request for an abortion; Sim and Picard deny that she ever spoke to them about an abortion; Ellis's contemporaneous medical notes specifically state that she does not want an abortion; and counselor Martin specifically denies that she ever asked about an abortion
 
 
 [2]
 Gibson brought an independent suit against the marshals that she had contact with in Texas, and that suit has been dismissed. Gibson v. Baker, et al., No. H-88-1669 (S.D.Tex. May 10, 1989)