*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0263P (6th Cir.)
File Name: 03a0263p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

LAURA TOMS and IRA
CHAIFFETZ,
    *Plaintiffs-Appellants,*

    *v.*

BOB TAFT; REGINALD J.
WILKINSON; ANTHONY J.
BRIGANO; LAWRENCE
BELSKIS; MARK CLARK,
    *Defendants-Appellees.*

No. 01-4035

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 00-00190—Edmund A. Sargus, Jr., District Judge.

Argued: February 5, 2003

Decided and Filed: July 31, 2003

Before: GILMAN and GIBBONS, Circuit Judges;
POLSTER, District Judge.*

_____

   * The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

_____

## COUNSEL

**ARGUED:** Arnold S. White, WHITE & FISH, Columbus, Ohio, for Appellants. Todd R. Marti, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellees. **ON BRIEF:** Arnold S. White, WHITE & FISH, Columbus, Ohio, for Appellants. Todd R. Marti, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, Linda L. Woeber, Ralph E. Burnham, MONTGOMERY, RENNIE & JONSON, Cincinnati, Ohio, Jeffrey Lynn Glasgow, Tracie M. Boyd, FRANKLIN COUNTY PROSECUTING ATTORNEY'S OFFICE, Columbus, Ohio, for Appellees.

   GIBBONS, J., delivered the opinion of the court, in which POLSTER, D. J., joined. GILMAN, J. (pp. 19-26), delivered a separate opinion concurring in part and dissenting in part.

_____

## OPINION

_____

   JULIA SMITH GIBBONS, Circuit Judge. Plaintiffs-appellants Laura Toms and Ira Chaiffetz, a prisoner, sought to marry, but were unable to obtain a marriage license because Chaiffetz's incarceration made it impossible for him to comply with an Ohio statute requiring both applicants for a marriage license to appear personally before the probate court. Toms and Chaiffetz sued various state officials under 42 U.S.C. § 1983, alleging a violation of their constitutional right to marry and seeking injunctive relief, monetary damages, and attorney's fees. With the district court's supervision, the parties reached a settlement with respect to the claims for injunctive relief, and Toms and Chaiffetz married. After the settlement was obtained, the district court

entered an order stating that plaintiffs' request for an injunction was moot. The district court also granted summary judgment in favor of defendants on the ground that they were protected by qualified immunity and refused to award attorney's fees because plaintiffs were not prevailing parties within the meaning of 42 U.S.C. § 1988. Plaintiffs appeal on four grounds, arguing that the district court erred by (1) granting summary judgment before discovery had commenced; (2) finding that the defendants were entitled to qualified immunity; (3) refusing to award monetary damages without considering evidence on the issue; and (4) refusing to award attorney's fees. For the reasons set forth below, we affirm the judgment of the district court on all four issues.

## I.

Ira Chaiffetz and Laura Toms (now Laura Chaiffetz) became engaged while Chaiffetz was incarcerated at the Warren Correctional Institution (WCI) in Warren County, Ohio. Like most states, Ohio requires prospective spouses to obtain marriage licenses. In order to do so, "[e]ach of the persons seeking a marriage license shall personally appear in the probate court within the county where either resides" to apply for a license. Ohio Rev. Code Ann. § 3101.05(A). The statute provides for a waiver of the personal appearance requirement in cases involving "illness or other physical disability," but there is no provision for a waiver due to incarceration.

Plaintiffs asked the probate courts of both Warren County and Franklin County, where Toms resides and where Chaiffetz resided before his incarceration, to waive the personal appearance requirement, but both courts declined.[1] Judge Lawrence Belskis of the Franklin County Probate

---

[1] Probate courts in other Ohio counties apparently interpret the personal appearance requirement more liberally, and at least 129 inmates in the Ohio Department of Rehabilitation and Correction's custody were married in 1998 and 1999.

Court, however, indicated that he was willing to assist plaintiffs by appointing either an employee of WCI designated by the warden, or an employee of the Warren County Probate Court, to serve as a deputy clerk of the Franklin County Probate Court for the purpose of issuing the marriage license. Belskis later memorialized these possibilities in an order issued December 30, 1999.

Toms wrote to Anthony Brigano, warden of WCI, on July 12, 1999, asking him to provide assistance in appointing someone to act as a deputy clerk and suggesting that Chaiffetz's attorney could serve in that capacity if Brigano preferred not to designate a WCI employee. Brigano declined this request in a letter, stating, "I do not see myself or the institution being involved in this process," other than allowing a brief marriage ceremony during normal visiting hours if the couple obtained a marriage license.

Toms and Chaiffetz obtained counsel, who wrote to Brigano on September 20, 1999, again requesting that he designate an employee of WCI to serve as a deputy clerk to issue the marriage license. Brigano denied this request, citing a policy of the Ohio Department of Rehabilitation and Correction (ODRC) that specifies that "all preparatory obligations, such as securing a marriage license, are the sole responsibility of the couple to wed." Plaintiffs received a similar response from Reginald Wilkinson, the director of the ODRC, who wrote, "It is not the responsibility of ODRC to obtain marriage licenses for the inmates in its custody . . . . The issuance of a marriage license is a function assigned by statute to the probate courts in Ohio." Wilkinson also quoted and attached the policy stating that securing a marriage license is the couple's responsibility.

Plaintiffs also sought to avail themselves of Judge Belskis' second option, a deputy clerk from the Warren County Probate Court who would travel to the correctional institution.

They wrote to Judge Mark Clark of that court.[2]  Clark declined to designate a clerk for that purpose, stating that "due to the numerous requests this Court receives and the hardship it places on our clerks, it is our policy that we do not send employees to the correctional facilities located in our County."  Finally, plaintiffs sought assistance from Ohio Governor Bob Taft, in a letter dated October 29, 1999. Governor Taft forwarded the request to the ODRC, and administrative assistant Stacha Doty responded that "Warden Brigano is correct in not deputizing an employee to serve the marriage license on the inmate.  That is not a part of the mission [of the ODRC]."  Doty also wrote that:

> No one is denying you the right to get married.  You are responsible to obtain a marriage license.  I am aware that Franklin County will not issue a marriage license without both parties present.  It is the policy of the [ODRC] not to transport inmates for the purpose of gaining a marriage license.

On February 18, 2000, Toms and Chaiffetz filed suit under 42 U.S.C. § 1983 against Taft, Brigano, Wilkinson, Belskis, and Clark, claiming violations of their right to marry and right to access to the courts and seeking injunctive and monetary relief.

The district court scheduled a settlement conference for March 31, 2000.  At the conference, defendants agreed that the Franklin County Probate Court would deputize an employee of the "central office" of the ODRC (specifically, an Assistant Attorney General) as a clerk to issue the marriage license to Chaiffetz at WCI.

The district court then recited this arrangement into the record to make sure the parties had reached "a meeting of the

_____

[2]Judge Clark was retired at that time, but no other judge had been named to replace him.

minds."  Plaintiffs accepted the outcome and asked that their request for injunctive relief be withdrawn as moot. The same day, March 31, 2000, the district court responded to this request by entering an order stating that "[t]he parties to this matter have resolved their differences.  The pending Motion for Preliminary and Permanent Injunction is therefore moot." Approximately two weeks later, plaintiffs were married.

The issues of damages and attorney's fees were not resolved at the conference.  After the conference, all defendants moved for summary judgment. Plaintiffs opposed summary judgment and sought discovery.  In an order dated January 4, 2001, the district court denied plaintiffs' motion for discovery because the defendants' arguments "were based on matters of law, namely whether the individual defendants are entitled to immunity."  In the same order, the court granted the defendants' motions for summary judgment, finding that they were entitled to qualified immunity because, even if the plaintiffs' rights to marry and to access to the courts were violated, neither right was "so clearly established that a reasonable official would understand that his actions violate[d] that right."

The district court's January 4, 2001, order did not address the issue of attorney's fees.  The parties therefore briefed the issue.  The district court denied plaintiffs' request for attorney's fees, finding that plaintiffs were not prevailing parties under 42 U.S.C. § 1988 (as explained by the Supreme Court in *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598 (2001)).  Plaintiffs timely appealed, contending that the district court erred by (1) granting summary judgment before discovery had begun, (2) finding that defendants were protected by qualified immunity, (3) denying monetary damages without considering evidence on the issue, and (4) denying plaintiffs' request for attorney's fees.

## II.

### A.   Grant of summary judgment before discovery

First, the Chaiffetzes contend that the district court erred by granting summary judgment before they had conducted discovery. We review for abuse of discretion. *See Emmons v. McLaughlin*, 874 F.2d 351, 356 (6th Cir. 1989).

In this case, the district court did not abuse its discretion by granting summary judgment before discovery had commenced. The basis for the district court's decision was its finding that defendants were protected by qualified immunity, a purely legal question. *Bell v. Johnson*, 308 F.3d 594, 601 (6th Cir. 2002) ("qualified immunity is a question of law"). To resolve that issue, the only question was whether plaintiffs' rights were "clearly established," thus putting defendants on notice that they may have been violating those rights. Although the Chaiffetzes cite various areas they would have investigated through discovery, such as the state's treatment of other prisoners who wished to marry, this information does not bear on the dispositive question of whether the prisoner's right to marry was "clearly established." Moreover, it is proper to decide the qualified immunity issue at the threshold of each case, before burdening potentially immune defendants with discovery. Where the defendant seeks qualified immunity and the defense is dispositive, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided. *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (*per curiam*) ("[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."); *Criss v. City of Kent,* 867 F.2d 259, 261 (6th Cir. 1988) ("[D]iscovery in litigation against government officials should be halted until the threshold question of immunity is resolved."). Thus, the district court did not abuse its discretion in granting summary judgment on the basis of qualified immunity before allowing discovery.

### B.   Qualified immunity

The Chaiffetzes' second argument is that the district court erred in finding that the defendants were protected by qualified immunity. Because this is a question of law, it is reviewed *de novo*. *Bell*, 308 F.3d at 601. Moreover, this court examines *de novo* all appeals arguing that summary judgment was improperly granted. *Summar v. Bennett*, 157 F.3d 1054, 1057 (6th Cir. 1998).

Generally, government officials performing discretionary functions are shielded from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In order for a right to be "clearly established," it must be established in a particularized, relevant sense: the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "[I]n the light of pre-existing law the unlawfulness must be apparent." *Id.* Government officials are shielded from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* at 638. Thus, officials are "entitled to qualified immunity [when] their decision was *reasonable,* even if mistaken." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

This court evaluates qualified immunity claims using a three-part inquiry. First, we determine whether the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). Second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known. *Id.* Finally, we determine whether the plaintiff has alleged sufficient facts,

and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights. *Id.*; *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999).

It is undisputed that the right to marry is protected by the Due Process Clause of the Fourteenth Amendment. *Zablocki v. Redhail*, 434 U.S. 374, 383 (1987). "The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (quoting *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942)). It is also undisputed that the right to marry extends to prisoners. *Turner v. Safley*, 482 U.S. 78, 95 (1987). However, the right is not unfettered. *Turner* holds that a prisoner's right to marry may be restricted where the restriction is reasonably related to a legitimate penological interest. *Id.* at 96-97. Applying that test, the *Turner* Court held unconstitutional a Missouri regulation that prohibited prisoners from marrying unless the superintendent found compelling reasons for allowing the marriage. *Id.* at 97-98. The Court noted that "legitimate security concerns" may require placing restrictions on an inmate's right to marry, *id.* at 97, and that the right "is subject to substantial restrictions as a result of incarceration," *id.* at 95. Therefore, *Turner* recognizes a prisoner's right to marry, but also recognizes that the right can be curtailed for penological reasons. In short, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89.

We hold that refusal to aid a prisoner in exercising his right to marry, where such refusal completely frustrates the right, can amount to a "prison regulation" under *Turner*. Therefore, such refusals must be reasonably related to legitimate penological interests. In this case, summary judgment was granted before state defendants were required to articulate a legitimate penological interest to justify their policy regarding

inmate marriage licenses.[3] Thus, we cannot determine whether the ODRC policy violated plaintiffs' rights. Rather, we note that the ODRC policy, although it does not affirmatively prohibit the exercise of the right to marry, is a regulation that must be justified under *Turner*'s test.

The second part of the qualified immunity inquiry asks whether the constitutional right was clearly established such that reasonable officials would know that their conduct violated the right. Plaintiffs have the burden of showing that a right is clearly established. *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995). The right must be clearly established in a particularized sense, as discussed above. However, as the Supreme Court has explained, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer,* 526 U.S. 730, 741 (2002). "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Id.* In determining whether a right is clearly established, "we look first to the decisions of the Supreme Court, then to the decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Bell v. Johnson*, 308 F.3d 594, 602 (6th Cir. 2002). The district court, analyzing relevant law, determined that a prisoner's "right to marry in this context was not so clearly defined that a reasonable person would have known that it was being violated by the defendant[s'] actions."

---

[3]The dissent would fault Brigano for failing thus far to articulate a legitimate penological interest justifying the ODRC policy. Judge Gilman states, "Brigano has not asserted before the district court or on appeal that his refusal to allow anyone at WCI to be deputized for matrimonial purposes was related to a legitimate penological interest." (Diss. Op. at 3.) It is premature at this point, however, to extract any meaning from defendants' failure to assert a legitimate penological interest. The litigation simply has not proceeded to the stage at which defendants are required to do so.

The Chaiffetzes argue that, in light of *Turner*, a prisoner's right to marry was sufficiently well-established that defendants should have known they were required to take affirmative steps to assist the plaintiffs in obtaining a marriage license. They also cite *Carter v. Dutton*, No. 93-5703, 1994 U.S. App. LEXIS 1268 (6th Cir. Jan. 21, 1994) (unpublished). In *Carter*, the Sixth Circuit held that a Tennessee regulation imposing a one-year waiting period on inmates who wished to marry was unconstitutional, but also found that the defendants were entitled to qualified immunity because *Turner* had not clearly defined the boundaries of the right to marry such that they knowingly violated it. In *Carter*, this court stated that "[t]he underlying issue is to what extent an inmate's marriage may be controlled by the state; and upon that issue there is no binding precedent." *Id.* at *2. Therefore, *Turner* had not "clearly established" the law such that state officials would know a one-year waiting period violated an inmate's right to marry. The Chaiffetzes cite no authority other than *Turner* and *Carter* to demonstrate that a prisoner's right to assistance in obtaining a marriage license was clearly established. Although both cases recognize that the constitutional right to marry extends to prisoners, neither defines the contours of the right. Specifically, neither case discusses whether prison officials and judges must affirmatively aid prisoners in their efforts to marry.

The lack of prior authority imposing a duty upon officials to act affirmatively to aid an inmate in exercising his right to marry indicates that qualified immunity is appropriate here. In *Gibson v. Matthews*, 926 F.2d 532 (6th Cir. 1991), an inmate brought suit alleging that prison officials violated her constitutional rights by not enabling her to have an abortion. The Sixth Circuit stated that "[t]he actions that Gibson thinks the prison officials should have performed fall, in our opinion, closer to a failure to act than a prohibition [of her exercise of the right]." *Gibson*, 926 F.2d at 536. While there may have been a right to abortion, there was no clearly established right of a prisoner "to require the aid of prison officials in procuring an abortion." *Id.* Similarly, in this case,

although Chaiffetz had the constitutional right to marry, there was no clearly established right to enlist the affirmative assistance of prison and judicial officials in attempting to exercise that right. When a prisoner is incarcerated, a "large number of rights are significantly curtailed because of the fact that the prisoner is not at physical liberty to make arrangements that would be possible were the prisoner able to travel in the community." *Id.*

Because the case law fails to show that an inmate's right to marry was so clearly established that an official reasonably would believe that declining to assist an inmate in obtaining a marriage license is unconstitutional, the Chaiffetzes have failed to meet their burden. We affirm the finding of qualified immunity.[4] However, in order to provide more guidance to officials in the future, we note that *Turner*'s test extends to situations in which an inmate's right to marry will be completely frustrated without prison officials' affirmative assistance. Although it was not previously clearly established, we now hold that the distinction between actively prohibiting an inmate's exercise of his right to marry and failing to assist is untenable in a case in which the inmate's right will be completely frustrated without officials' involvement. Therefore, where an inmate will be unable to marry without prison officials' affirmative assistance, *Turner*'s strictures apply. The inmate's right to marry may be curtailed only where the officials' refusal to assist the inmate is reasonably related to legitimate penological interests.

---

[4]The dissent would affirm the grant of summary judgment on the basis of qualified immunity to all defendants except Brigano, who in Judge Gilman's view "should have known that his actions violated Ira Chaiffetz's clearly established constitutional rights." (Diss. Op. at 1.) However, the dissent fails to explain why Brigano would be treated differently than Taft or Wilkinson, who both also received correspondence from plaintiffs and who both presumably had the authority to alter the policy at issue.

The dissent asserts that the action/inaction dichotomy is "a distinction without a difference in this context." (Diss. Op. at 4.) We agree that the action/inaction distinction should not ultimately relieve officials from liability where they knowingly violated the prisoner's constitutional right through inaction rather than through affirmatively prohibiting the exercise of the right. We have set forth this principle in order to establish it more clearly for government officials in the future. We do not, however, believe that this principle was sufficiently clearly established in a particularized, relevant sense during the time period in which Brigano acted (or failed to act). *See Anderson*, 483 U.S. at 640. In *Gibson*, this court held that the law had not clearly established that prison officials were required to *facilitate* prisoners in their requests for abortions, although prior cases had held that prisoners had the right *not to be prevented* from having an abortion. *Gibson*, 926 F.2d at 535. Thus, if Brigano considered *Gibson*, he could reasonably have believed that Chaiffetz had no constitutional right to require officials' affirmative assistance in marrying simply because one case, *Turner*, had held unconstitutional a policy *prohibiting* marriages.

The dissent argues that one can view *Turner* as clearly establishing the right at issue, if one characterizes the regulation in *Turner* as "a failure by prison officials to 'affirmatively aid' inmates in marrying." (Diss. Op. at 4.) The Supreme Court, however, characterized the rule as a "prohibition." *Turner*, 482 U.S. at 97. The dissent's reading of the *Turner* regulation as "a failure by the prison's superintendent to provide a chaplain to perform marriages . . . ", Diss. Op. at 4, does not find support in the Supreme Court's opinion. It included no discussion of the logistics of prison marriage ceremonies, other than to affirm that prison officials may regulate the time and circumstances under which the ceremonies take place. *Turner*, 482 U.S. at 99. The regulation at issue did not amount to a mere "failure to provide . . . a chaplain"; rather it banned all inmate weddings absent the superintendent's express permission, given only for compelling reasons. A reasonable government official would

not read *Turner* to eradicate the action/inaction distinction. Indeed, this court did not consider *Turner* to have done so, as its opinion in *Gibson* reveals. Nor would a reasonable warden necessarily believe that ODRC's policies for handling inmate weddings, under which more than one hundred Ohio inmates were able to marry in 1998 and 1999, were unconstitutional.[5] The dissent cites no additional cases in support of its argument that the right at issue was clearly established. The reasoning of an applicable precedent, even if its facts are not fundamentally similar, can make obvious a government official's legal obligations, as the dissent notes and as *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), explains. But *Turner* did not make clear that Brigano was required to affirmatively assist Chaiffetz in his attempts to obtain a marriage license.

## C.  Monetary Damages

The Chaiffetzes' third contention is that the district court "erred in its summary judgment order by denying appellants without a hearing their right to show that they were entitled to money damages." However, an award of monetary damages is unavailable, given that the defendants are entitled to qualified immunity. The effect of qualified immunity is to protect government defendants from liability, including monetary liability. *Harlow*, 457 U.S. at 818 (qualified immunity shields eligible officials from liability for civil damages). Therefore, it was not error for the district court to decline to hold a hearing.

---

[5]Although courts engaging in qualified immunity analyses often consider only case law when determining whether the right at issue was clearly established, the Supreme Court in *Hope* also considered a Department of Justice report and an Alabama Department of Corrections regulation in deciding whether the officials were on notice that their conduct violated the plaintiff's rights. *Hope*, 536 U.S. at 744-45. In this case, therefore, while not dispositive, it is appropriate to consider the ODRC's policy, on which Brigano apparently relied, that "all preparatory obligations, such as securing a marriage license, are the sole responsibility of the couple to wed," in determining whether he knowingly violated plaintiffs' rights.

**D.   Attorney's fees**

Finally, the Chaiffetzes contend that the district court erred in declining to award attorney's fees pursuant to 42 U.S.C. § 1988.  The statute, 42 U.S.C. § 1988, provides that a court may grant attorney's fees to "the prevailing party."  The Supreme Court has limited the term "prevailing party" to a party who obtains either "a judgment on the merits" or a "court-ordered consent decree."  *Buckhannon Bd. and Care Home, Inc. v. W. Va. Dept. of Health and Human Resources*, 532 U.S. 598, 600 (2001).  Because the Chaiffetzes obtained neither a "judgment on the merits" nor a "court-ordered consent decree," they are not eligible for attorney's fees.

In *Buckhannon*, the plaintiff obtained the result it was seeking when the West Virginia legislature, which was not a party to the lawsuit, changed a statute.  The Court held that the plaintiff was not a prevailing party in that lawsuit, thus precluding it from obtaining attorney's fees.  The Court stated:

> Numerous federal statutes allow courts to award attorney's fees and costs to the "prevailing party."  The question presented here is whether this term includes a party that has failed to secure a judgment on the merits or a court-ordered consent decree, but has nonetheless achieved the desired result because the lawsuit brought about a voluntary change in the defendant's conduct.  We hold that it does not.

532 U.S. at 600.  In order to "prevail," and thus to become eligible for attorney's fees, a party must have obtained a "judicially sanctioned change in the legal relationship of the parties."  *Id.* at 605.  "A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change."  *Id.*  Only "enforceable judgments on the merits and court-ordered consent decrees create the material alteration of the legal relationship of the parties necessary to permit an award of attorney's fees."  *Id.* at 604 (internal quotation marks omitted).  Private settlement agreements do not confer prevailing party status.  *Id.* at 604 n. 7 ("Private settlements do not entail the judicial approval and oversight involved in consent decrees.").

In this case, plaintiffs obtained defendants' "voluntary change in conduct," when the state defendants agreed to allow an employee of the ODRC to be deputized in order to issue the marriage license.  However, plaintiffs did not obtain a "judgment on the merits."  The only judgment on their request for injunctive relief declared that the request was mooted by the parties' voluntary actions.  Nor did plaintiffs obtain a "court-ordered consent decree."  Although the settlement conference occurred at the district court, with the district judge's involvement, the resulting settlement did not bear the necessary "judicial imprimatur."  For example, no judicial oversight was involved in enforcing the settlement, and the district court did not issue any order altering the defendants' conduct.  The district court itself did not consider its action to be a "consent decree" leading to prevailing party status under *Buckhannon*.  The district court stated:

> [T]here has not been a court ordered consent decree.  Although the parties settled the Plaintiff's [sic] claim for injunctive relief at a Court sponsored settlement conference, the record is clear that the agreement was purely a private one that resulted in no Court ruling or Order on the merits.  Moreover . . . the fact that the Court's Opinion and Order on summary judgment indicates a potential violation of the Constitution is of no moment under *Buckhannon* because the Court has ordered no judicial relief in this case.  As no judicial relief was granted in this case, nor was any consent decree issued, the court concludes that the Plaintiffs are not prevailing parties . . . .

In light of the Chaiffetzes' failure to obtain a judgment on the merits or a court-ordered consent decree, they are not entitled to attorney's fees under *Buckhannon*.

The Chaiffetzes contend that *Buckhannon* should not apply to this case because it was initiated before *Buckhannon* was decided.[6] *Buckhannon* was decided on May 29, 2001. The district court, having been apprised of *Buckhannon* by the judicial defendants, issued its order denying attorney's fees on September 7, 2001.

The Chaiffetzes' argument fails. There is no authority for the Chaiffetzes' suggestion that *Buckhannon* should not apply to their case. The case they cite in support of their position, *Chevron Oil v. Huson*, 404 U.S. 97 (1971), has been overruled to the extent that it permits the selective prospective-only application of a new rule of law. *See Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 752 (1995). Instead, we apply the following principle announced by the Supreme Court:

> When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.

*Harper v. Va. Dept. of Taxation*, 509 U.S. 86, 97 (1993). Under this rule, it was proper for the district court to consider

---

[6]The Chaiffetzes instead ask that this court apply pre-*Buckhannon* law to their request for attorney's fees. Before *Buckhannon*, courts applied the so-called "catalyst theory." Under the "catalyst theory," a plaintiff who obtained relief through a settlement was a prevailing party if the plaintiff could (1) demonstrate that his or her lawsuit was causally related to securing the relief obtained and (2) establish some minimum basis in law for the relief secured. *Johnston v. Jago*, 691 F.2d 283, 286 (6th Cir. 1982). *Buckhannon* struck down the catalyst theory.

*Buckhannon* in deciding whether to grant attorney's fees. The Sixth Circuit and other courts have similarly applied the *Buckhannon* prevailing party rule to cases that were pending when *Buckhannon* was decided. *See Chambers v. Ohio Dept. of Human Serv.*, 273 F.3d 690, 692-93 (6th Cir. 2001); *N.Y. State Fed'n of Taxi Drivers, Inc. v. Westchester County Taxi and Limousine Comm'n*, 272 F.3d 154, 158-59 (2d Cir. 2001); *Johnson v. Rodriguez*, 260 F.3d 493, 495 (5th Cir. 2001); *Bennett v. Yoshina*, 259 F.3d 1097, 1100-01 (9th Cir. 2001).

Therefore, the district court was correct in applying *Buckhannon* to this case. Because the Chaiffetzes were not prevailing parties under *Buckhannon*, the district court was also correct in determining that the Chaiffetzes were not eligible for attorney's fees.

### III.

For the foregoing reasons, we affirm the judgment of the district court in all respects.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

RONALD LEE GILMAN, Circuit Judge, concurring in part and dissenting in part. I concur in the majority's conclusion that Bob Taft, Reginald J. Wilkinson, Lawrence Belskis, and Mark Clark are entitled to summary judgment. Based upon the present record, however, I believe that Warden Anthony J. Brigano should have known that his actions violated Ira Chaiffetz's clearly established constitutional rights, thus precluding his entitlement to summary judgment on the basis of qualified immunity. I therefore respectfully dissent from the majority's conclusion to the contrary.

The facts in this case that are pertinent to Brigano's claim of qualified immunity are not in dispute. Ira Chaiffetz sought to marry Laura Toms while he was an inmate at the Warren Correctional Institution (WCI). Ohio statutory law, however, mandates that in order to receive a marriage license, "[e]ach of the persons seeking a marriage license shall personally appear in the probate court within the county where either resides." Ohio Rev. Code § 3101.05(A).

Chaiffetz and Toms investigated various avenues for satisfying the personal-appearance requirement. A judge of the Franklin County Probate Court informed them that someone at WCI could be deputized as an official of the court for that purpose. Toms therefore wrote a letter to WCI Warden Brigano, explaining:

> I spoke at length with the Magistrate at the Franklin County Probate Court and was told that the appointed Deputy Clerk need not be a prison employee; it can be anyone the Warden is willing to allow to act in this manner. With your assistance, I believe we can find a workable solution. I am willing to cooperate with

> anyone that you would find acceptable to serve as Deputy Clerk, and will pay him or her for his services.

Brigano replied that he was denying Toms's request. He gave no explanation other than to state that "I do not see myself or the institution being involved in this process . . . ." Scott P. Bellinger, an attorney retained by Toms, then raised the issue in a second letter to Brigano. Brigano again denied the request with little explanation:

> Your request that we assist by designating a staff person as a "deputy clerk to issue the marriage license" for Ms. Toms and inmate Chaiffetz must be denied. Our policy regarding inmate marriages which is attached for your review states "all preparatory obligations, such as securing a marriage license, are the sole responsibility of the couple to wed."

Brigano's refusal to allow anyone, WCI employee or not, to serve as a deputy clerk resulted in Chaiffetz's inability to marry.

The Supreme Court, on the other hand, has declared that prisoners retain their fundamental right to marry. *Turner v. Safley*, 482 U.S. 78, 95 (1987). Further, where a prison regulation impinges upon this right, the regulation is valid only "if it is reasonably related to legitimate penological interests." *Id.* at 89. The prison regulation in the present case—that "all preparatory obligations, such as securing a marriage license, are the sole responsibility of the couple to wed"—completely thwarted Chaiffetz's constitutional right to marry. Unless the regulation was reasonably related to a legitimate penological interest, therefore, Chaiffetz's constitutional rights were violated by Brigano's application of the prison policy; that is, by Brigano's refusal to allow anyone to serve as a deputy clerk.

In light of *Turner*, any reasonable prison warden under the circumstances should have recognized the unlawfulness of

applying a policy that completely denied a prisoner the right to marry. Brigano has not asserted before the district court or on appeal that his refusal to allow anyone at WCI to be deputized for matrimonial purposes was related to a legitimate penological interest.

The majority nevertheless concludes that Brigano is entitled to qualified immunity because the policy prohibiting inmates from marrying (by preventing them from obtaining marriage licenses) did so implicitly, rather than explicitly. According to the majority, "neither [*Turner* nor an unpublished Sixth Circuit case] discusses whether prison officials and judges must affirmatively aid prisoners in their efforts to marry." (Maj. Op. at 11) But neither do these cases relieve a prison official from liability for enforcing regulations that completely frustrate an inmate's right to marry simply because the official chooses to "stick his head in the sand."

To marry under Ohio law, a couple must obtain a marriage license and then have their union solemnized by an authorized official. Ohio Rev. Code §§ 3101.05 (marriage license) and 3101.08 (who may solemnize). Take away either the license or the official, and one cannot marry. The prison regulation applied by Brigano to Chaiffetz in this case effectively told the prisoner: "Sure you can marry. You just can't have the required license." That is doublespeak. No warden could reasonably believe that he was complying with *Turner*'s command by adopting the position taken by Brigano in this case.

The regulation challenged in *Turner* "permit[ted] an inmate to marry only with the permission of the superintendent of the prison, and provide[d] that such approval should be given only 'when there are compelling reasons to do so.'" 482 U.S. at 82. According to the Supreme Court, the constitutional issue was whether that "regulation impermissibly burden[ed] the right to marry." *Id.* at 97. The Court concluded: "It is undisputed that Missouri prison officials may regulate the time and circumstances under which the marriage ceremony

itself takes place. On this record, however, the almost complete ban on the decision to marry is not reasonably related to legitimate penological objectives." *Id.* at 99 (citation omitted).

Nothing in the Court's analysis depended on the precise method by which the prison officials made marriage impossible. In fact, one could easily characterize the prison regulation at issue in *Turner* as a failure by the prison's superintendent to provide a chaplain to perform marriages unless he agreed that there were compelling reasons to do so. Thus viewed, *Turner* itself involved a failure by prison officials to "affirmatively aid" inmates in marrying. The action/inaction dichotomy, in other words, is a distinction without a difference in this context. Even the majority recognizes that "the distinction between actively prohibiting an inmate's exercise of his right to marry and failing to assist *is untenable* . . . ." (Maj. Op. at 12) (Emphasis added.) One wonders how a reasonable official could believe himself to be complying with Supreme Court precedent by relying upon an "untenable" distinction.

The primary answer to this question, according to the majority, is that this court's decision in *Gibson v. Matthews*, 926 F.2d 532 (6th Cir. 1991), generally sanctions the action/inaction distinction in the context of prison regulations. (*See* Maj. Op. at 13) ("Thus, if Brigano considered *Gibson*, he could reasonably have believed that Chaiffetz had no constitutional right to require officials' affirmative assistance in marrying simply because one case, *Turner*, had held unconstitutional a policy *prohibiting* marriages.") (Emphasis in original). In *Gibson*, the court considered the § 1983 claim of a prisoner who had "wanted to have an abortion and was not enabled to do so as a result of the actions of different federal officials." 926 F.2d at 533. This court concluded that summary judgment for the defendants was appropriate because they were entitled to qualified immunity.

In my opinion, *Gibson* does not support the majority's analysis. Part of the problem may be the way the majority summarizes *Gibson*, which is as follows: "In *Gibson*, this court held that the law had not clearly established that prison officials were required to *facilitate* prisoners in their requests for abortions, although prior cases had held that prisoners had the right *not to be prevented* from having an abortion." Maj. Op. at 13 (citing *Gibson*, 926 F.2d at 535) (Emphasis in original). The second half of the majority's recitation is incorrect. What the *Gibson* court actually said was: "At the time these events took place, there were *no reported cases* regarding the abortion rights of prisoners." 926 F.2d at 535 (emphasis added). In the present case, on the other hand, *Turner* clearly set forth the right of prisoners to marry prior to Brigano's actions.

The *Gibson* court did discuss the right of citizens generally (not prisoners) to abortions, and it recognized that although certain Supreme Court decisions had held "that the government cannot restrict access to abortions [where] the government acted wholly in a prohibitory manner," other cases established "that the government was not under an obligation to facilitate abortions." *Id.* at 536. But I cannot conceive that the court's discussion would have given Brigano cause to think that he could deny, for no penological reason, a prisoner the right to marry so long as the policy he was enforcing was phrased in terms of inaction. This is due to the fact that a physician can provide an abortion without the aid of the state, whereas a marriage does not *exist* without the state. That an action/inaction distinction has currency in the context of abortion, therefore, provides no reason to suppose that it has meaning in the context of the right to marry. Indeed, as explained above, the action/inaction distinction in this context amounts to no more than sophisticated wordplay.

"Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to

such a finding." *Hope v. Pelzer*, 122 S. Ct. 2508, 2516 (2002). The *rationale* of applicable precedent, at least as much as the precise facts of the case, is sufficient to give officials fair notice concerning their legal obligations. *Id.* at 2517. In *Hope* itself, for example, the Supreme Court held that prison guards could not reasonably believe that it was constitutional to wantonly hitch prisoners to a *post* for hours on end, even though circuit precedent dealt only with hitching prisoners to *fences*. *Id.* Similarly, no warden could have reasonably doubted the unconstitutionality of a regulation that banned inmates from marrying (by preventing them from getting marriage licenses) on the basis that the regulation in *Turner* banned inmates from marrying by another means (by subjecting the request to the unfettered discretion of the superintendent). The Supreme Court clearly stated in *Hope* "that officials can still be on notice that their conduct violates established law even in novel factual situations." *Id.* at 2516.

I am therefore of the opinion that we should reverse the district court's grant of summary judgment to Brigano. If his refusal to appoint a probate court deputy clerk at WCI was in furtherance of a legitimate penological interest, he can develop the facts supporting such an argument on remand. The district court would remain free to grant him judgment as a matter of law on the ground of qualified immunity should such facts be developed. On the present record, however, Brigano is not entitled to qualified immunity because he applied a prison regulation to completely deny an inmate's right to marry without any apparent penological justification. I would therefore reverse the portion of the district court's judgment that grants Brigano qualified immunity and remand for further proceedings.

Finally, a word of explanation is in order as to why I believe that summary judgment in favor of Bob Taft and Reginald J. Wilkinson was proper, but was not proper as to Brigano. The majority expresses puzzlement that "Brigano would be treated differently than Taft or Wilkinson, who both also received correspondence from plaintiffs and who both

presumably had the authority to alter the policy at issue." (Maj. Op. at 12 n.4) There are, however, material differences in the actions taken by each of these gentlemen vis-a-vis the Chaiffetzes.

Section 1983 makes liable only the "person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution." 42 U.S.C. § 1983. The Chaiffetzes brought suit against many officials, but "[i]f any one of them is to be held liable, it must be based on the actions of that defendant in the situation that the defendant faced." *Gibson*, 926 F.2d at 535. Section 1983 plaintiffs cannot prevail on a theory of respondeat superior. *Combs v. Wilkinson*, 315 F.3d 548, 557-58 (6th Cir. 2002) ("Plaintiffs essentially seek to impose respondeat superior liability against the supervisory officers, ManCI, ODRC, and/or the state of Ohio for the actions of these unidentified officers. It is well settled that § 1983 liability will not be imposed solely on the basis of respondeat superior.").

I first turn to Wilkinson's claim of immunity. He is the Director of the Ohio Department of Rehabilitation and Correction. This supervisory position does not require him to actually apply prison regulations to any particular inmate. Wilkinson's direct involvement in this case is in fact very limited. After receiving no relief from Brigano, the attorney for Toms wrote a letter to Wilkinson on September 24, 1999. The first sentence of the letter stated: "The purpose of this correspondence is to inquire as to the State of Ohio's procedures for inmates to exercise their constitutional right and obtain a marriage license while incarcerated outside of their county of residence." Assistant Chief Counsel T. Austin Scott replied to this letter on Wilkinson's letterhead, attaching a copy of the Ohio policy on inmate marriages. Replying to this request for information did not violate any clearly established constitutional rights.

Analysis of Bob Taft's actions leads to a similar conclusion. As governor of Ohio, Taft was not responsible for applying prison regulations to any particular inmate. Toms nevertheless sent him a letter dated October 29, 1999 that sought his assistance. He forwarded the letter to the Ohio Department of Rehabilitation and Correction. I am aware of no case law identifying this action as constitutionally problematic, much less clearly so.

Summary judgment was therefore proper for Wilkinson and Taft, neither of whom actually applied a prison regulation to Chaiffetz. But Brigano, on his own authority and without any direct order from Wilkinson, Taft, or any other superior, did so act. In light of *Turner*, I believe that he should have known better. I therefore respectfully dissent from the majority's contrary conclusion.